UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

**03-74313**

**FILED**

OCT 2 7 2003

CLERK'S OFFICE-DETROIT-PSG
U.S. DISTRICT COURT

JAMES D. NICHOLS,

Plaintiff,

V

MICHAEL MOORE,

Defendant.

~~JUDGE COPY~~

**COMPLAINT AND
JURY DEMAND**
CASE NUMBER

PAUL D. BORMAN

MAGISTRATE JUDGE MORGAN

COMPLAINT

JURSIDICTION

Plaintiff states:

1.    Plaintiff is a citizen and resident of Sanilac County, Michigan.

2.    Defendant, Michael Moore, is a citizen of New York.

3.    There is complete diversity of citizenship between the Plaintiff and the

      Defendant and the matter in controversy exceeds, exclusive of interest and

      costs, the sum of $75,000.  Therefore, this court has subject matter jurisdiction

      over this action pursuant to 28 U.S.C. § 1332(a).

4.    This court may exercise personal jurisdiction over the Defendant because this

      Defendant has continuous and substantial contacts with the State of Michigan,

      including, but not limited to, contacting the Plaintiff and arranging to meet

      Plaintiff at his home in Decker, Michigan in order to interview the Plaintiff,

      premiering his film, Bowling for Columbine, the subject of this action, in

- 1 -

Flint, Michigan and releasing his film in theaters throughout the State of Michigan.

## FACTUAL BACKGROUND

5. Defendant, Michael Moore, created a documentary film called "Bowling for Columbine." The film premiered in Flint, Michigan on October 28, 2002 and was circulated throughout the United States and internationally thereafter.

6. Defendant released Bowling for Columbine on VHS and DVD for sale and rent on or about August 19, 2003.

7. Plaintiff became aware of the movie on October 29, 2002, when a writer from the Flint Journal called Plaintiff to ask for his comments about the movie, which featured the Plaintiff. Plaintiff did not know what movie the writer was referring to and began to investigate. The Defendant never contacted Plaintiff to inform him that he was going to be featured in Defendant's motion picture movie, Bowling for Columbine, nor did the Defendant inform Plaintiff when the movie would be released, even though the movie premiered in Flint, Michigan, less than sixty miles from Plaintiff's residence.

8. During the fall of 2000, the Defendant contacted Plaintiff via telephone, represented to Plaintiff that he was working on a documentary and arranged to interview Plaintiff at his home in Decker, Michigan about the Oklahoma City Bombing. Within an hour, the Defendant arrived at Plaintiff's home, along with four other people, and conducted and tape-recorded a live interview with the Plaintiff. Plaintiff did not know who the Defendant was, nor did Plaintiff know that the Defendant's purpose in interviewing him was to portray the

Plaintiff in as false a light as possible. Plaintiff only agreed to be interviewed because he thought the Defendant wanted to learn more about the Oklahoma City Bombing and his brother, Terry Nichols', pending trial. Throughout the interview, Defendant kept changing the subject from the Oklahoma City Bombing to guns. During one portion of the interview, Plaintiff agreed to show Defendant Plaintiff's gun, which was located under his pillow in his bedroom. Plaintiff specifically instructed Defendant to not videotape Plaintiff's bedroom. The Defendant agreed. Plaintiff later found out, by watching Bowling for Columbine, that the Defendant did, in fact, videotape Plaintiff's bedroom and included it in his movie. The interview lasted approximately three hours. The Defendant and his crew left and Plaintiff never heard from the Defendant again.

9.  The Defendant did not inform Plaintiff that he would be using his interview with the Plaintiff for pecuniary gain.

10. The Defendant never obtained a release from the Plaintiff.

11. The Defendant did not tell Plaintiff that the real purpose of his visit to Plaintiff's home was to create a calculatedly false and inaccurate impression of Plaintiff as a criminal.

12. Bowling for Columbine has received accolades from around the world. The Defendant accepted an Academy Award on March 23, 2003 for "Best Documentary Feature." Bowling for Columbine is the most moneymaking non-concert documentary of all time. The Defendant has made millions of dollars from Bowling for Columbine, presenting it to the public as a

documentary while falsely accusing the Plaintiff of being a co-conspirator in the Oklahoma City Bombing.

13.   Bowling for Columbine features the Plaintiff by showing approximately ten minutes of Defendant's interview with Plaintiff within the first twenty minutes of the film and also shows Plaintiff's farm and portions of Plaintiff's home, located in Decker, Michigan.

14.   The Defendant wrote and narrated Bowling for Columbine.

15.   The Defendant made the following statements in Bowling for Columbine while showing Plaintiff's farm:

"On this farm in Decker, Michigan, McVeigh and the Nichols brothers made practice bombs before Oklahoma City. Terry and James were both arrested in connection to the bombing. Terry Nichols was convicted and received a life sentence. Timothy McVeigh was executed, but the feds didn't have the goods on James so the charges were dropped." These statements are libel per se. One VHS copy of Bowling for Columbine has been attached for filing purposes as Exhibit "A". Plaintiff presumes that Defendant is in possession of and/or has access to his film.

16.   These statements were meant and intended to convey that Plaintiff was and is guilty of conspiring with Terry Nichols and Timothy McVeigh to practice making bombs in order to carry out the Oklahoma City Bombing, thereby accusing the Plaintiff of being complicit in the Oklahoma City Bombing. These statements were also meant and intended to convey that the Plaintiff was involved in the Oklahoma City Bombing but got away with it because the

feds could not deliver the goods against Plaintiff as they had with his fellow

co-conspirators.  These statements are completely false.

17.     The Defendant also included in his documentary Bowling for Columbine a

portion of his interview with the Plaintiff wherein he asked the Plaintiff, "Did

Tim McVeigh ever stay here?"  The Plaintiff replied, "Yes. He stayed here

several times, for the longest period, about three months or so."

18.     Within days of the release of Bowling for Columbine, the Defendant was a

guest on the Oprah Winfrey show on November 1, 2002.  The Defendant

showed a clip from Bowling for Columbine, featuring a portion of his

interview with the Plaintiff, and introduced the clip as follows:

"They—McVeigh and Nichols were in the thumb of Michigan living there for

a number of months and making practice bombs and—in preparation for

Oklahoma City."  This statement is libel per se.  A copy of the relevant

portions of the transcript of the November 1, 2002 Oprah Winfrey show is

attached to this complaint as Exhibit "B" and incorporated by reference.

19.     This statement by the Defendant on the Oprah Winfrey showed, which aired

on national television on November 1, 2002 and March 3, 2003, was meant

and intended to convey that Plaintiff was and is guilty of conspiring with

Terry Nichols and Timothy McVeigh specifically by helping them make

practice bombs to prepare them to carry out the Oklahoma City Bombing.

When Defendant stated that they "were in the thumb of Michigan living there

for a number of months", the "there" he is referring to is Plaintiff's home in

Decker, Michigan. The Defendant specifically asked Plaintiff about this in

Bowling for Columbine.

20. The Defendant's statements accusing the Plaintiff of being complicit in the

Oklahoma City Bombing are false. The Plaintiff was thoroughly investigated

by the United States government and all charges against him were dismissed.

21. The Defendant's statements were meant and intended to hold Plaintiff in

contempt in the eyes of the world.

22. In a November 5, 2002 interview, the Defendant was asked why more people

don't decline his interview requests because of his guerrilla approach. He

replied, "I wouldn't talk to me. Because I would think, if Michael Moore's

coming to see me, it is not because I've just called 1-800-FLOWERS. He's

not here to deliver roses. But people want to be on TV. You go up to Charlton

Heston and say, 'I'm making a movie. I want you in my movie.' The

seductive lure of that outweighs the negative possibilities." Plaintiff would

have never agreed to be interviewed by the Defendant had he known

Defendant's intentions. Plaintiff was 'seductively lured' by Defendant's

representation to Plaintiff that he was interested in finding out more

information about the Oklahoma City Bombing. The Defendant set up the

interview with Plaintiff under false pretenses and with the intent to cause harm

to the Plaintiff. This article has been marked Exhibit "C" and is attached to

this complaint and incorporated by reference.

23. The Defendant published the false and defamatory statements with malice,

knowing that the statements were false or with reckless disregard of the truth

or falsity of the statements for the two-fold purpose of injuring Plaintiff and for Defendant's own pecuniary gain.

24.     On November 26, 2002, Plaintiff, pursuant to M.C.L.A. 600.2911(2)(b), caused to be delivered to Defendant's attorney, by certified mail, a notice and demand to be answered within two weeks after receipt of the communication. This demand and notice requested that the Defendant publish or cause to be published a full and fair retraction. A copy of this demand for retraction is attached to this complaint as Exhibit "D" and incorporated by reference.

25.     On December 23, 2002, the Defendant's attorney notified counsel for Plaintiff by written correspondence that Defendant refused to retract any of his statements. A copy of Defendant's refusal to retract is attached as Exhibit "E" and incorporated by reference.

26.     The Defendant had a high degree of awareness of the falsity of the publication because the government dropped the charges against the Plaintiff. In his letter refusing to retract the defamatory statements, the Defendant attempted to claim that his statements pertaining to the Plaintiff in Bowling for Columbine and on the Oprah Winfrey show are protected under the First Amendment and the "fair report" privilege, however "fair report" does not permit the Defendant to declare on his own authority the existence of facts that are only asserted in a proceeding. And this is precisely what he has done. The Defendant asserts as true portions of the criminal complaint against the Plaintiff. The Defendant cannot rely on that criminal complaint seven years after the fact when all of the charges against the Plaintiff based on that

complaint were dismissed and the federal judge presiding over the case declared that there was not an iota of evidence that James Nichols was a danger to others.  A cursory review of the transcripts of Plaintiff's May 23, 1995 bond hearing, or any of the numerous articles summarizing the bond hearing, would have revealed that the government did not have any evidence to support the charges against James Nichols.

27.   The Defendant's malice is evidenced by the false pretenses under which he approached the Plaintiff, claiming to want to talk to him about the Oklahoma City Bombing and Plaintiff's brother Terry Nichols' pending trial.  Plaintiff thought that the Defendant was genuinely interested in obtaining more information about that proceeding.  Instead, the Defendant made every effort to portray the Plaintiff in a false light, culminating in Defendant's pronouncement both in his documentary and on the Oprah Winfrey show that the Plaintiff was involved in the Oklahoma City Bombing and got away with it.

28.   The Defendant's malice against the Plaintiff is further evidenced by the comments he made on the Oprah Winfrey show immediately after he presented the clip featuring the Plaintiff.  Oprah Winfrey states, "And the interesting thing is he (James Nichols) told you at the beginning of the interview, he starts out—he tells you he's a soybean farmer." (clarification added.)  The Defendant responds, "Yeah. He likes tofu. And he's very into natural stuff, no chemicals, and I thought he was one of these back-to-the-earth kind of guys. And then the more that you—he opens up and reveals, you

know, what he believes in, and—but the—but the scariest thing, I thought, of all that was that—that here's a guy, went—you know, grew up in the same educational district as I grew up in and he didn't know who Ghandi was. How can you go through an American education and not know about Gandhi or what Gandhi did? And I started to think more after I left that, you know, this gets to the core of what I really think the problem is. Yes, we have too many guns. But because we don't have a priority on education in this country and so many other things we—we allow a situation to get much worse." The Defendant goes on to tell Oprah Winfrey that this "contributes to why we have more violence." The Defendant maliciously portrays the Plaintiff as the poster child for what is wrong with America today, and falsely accuses him of being one of the perpetrators in the second worst act of terrorism in the history of the United States.

29.     Defendant's malice and intent to portray Plaintiff in a false light is further evidenced by Defendant's willful decision to exclude portions of his interview with the Plaintiff that showed Plaintiff to be an educated, law-abiding citizen. During his interview with the Plaintiff, the Defendant asked the Plaintiff about guns and gun safety. Plaintiff explained to the Defendant the importance of teaching gun safety and told the Defendant about how the Plaintiff taught his own son about gun safety, at a very young age. Even though Bowling for Columbine was about guns, the Defendant chose to exclude this portion of the interview from his documentary because it showed the Plaintiff as an

educated, responsible gun owner and did not comport with the false light the

Defendant intended to impute to the Plaintiff.

30.     The Defendant made false criminal accusations against the Plaintiff in a

documentary. A documentary is defined as presenting facts objectively

without editorializing or inserting fictional matter, as in a book or motion

picture. Webster's New College Dictionary 335 (2d ed. 2001). Within his

documentary, the Defendant matter-of-factly states that the Plaintiff, along

with Timothy McVeigh and Terry Nichols, made practice bombs before the

Oklahoma City Bombing. This statement is completely false. There was and

is no evidence to suggest that anyone on Plaintiff's farm was practicing

making bombs. At Plaintiff's bond hearing on May 23, 1995, United States

District Judge Paul Borman asked the federal prosecutors prosecuting

Plaintiff's case if the Plaintiff should have to get the approval of the Treasury

Department of the United States in order to blow a tree stump out of his back

forty acres. The federal prosecutors answered the question in the negative.

Judge Borman further noted at Plaintiff's bond hearing that, "There is not an

iota of evidence that he (James Nichols) is a danger to others." He then

ordered Mr. Nichols to be released on his own recognizance. The government

dismissed the charges against Mr. Nichols, with then United States Attorney

General Janet Reno making an announcement to that effect on national

television. News of the charges being dismissed against James Nichols made

both national and international headlines in May of 1995. It is, therefore,

most egregious and reprehensible for the Defendant to accuse the Plaintiff of

being complicit in such a horrific crime, particularly when the Plaintiff has already been through a full blown criminal investigation and cleared of any wrong doing. The Defendant acted with malice by making these false accusations against Plaintiff in a documentary, which the Defendant knew would be considered to be factually accurate by viewers. In fact, the Defendant was recently called to task on the accuracy of the statements he made in Bowling for Columbine. On August 19, 2003, the Defendant told MSNBC that "Every fact in the film (Bowling for Columbine) is true, absolutely true, and anybody who says otherwise is committing an act of libel." (clarification added.)

31.  The Defendant has also committed defamation by implication against the Plaintiff by stating that, "the feds didn't have the goods on James, so the charges were dropped." This statement by the Defendant, particularly within the context of a documentary, presumes that there were goods to be delivered. The Defendant's statement implies that the Plaintiff was complicit in the Oklahoma City Bombing but that he got away with it. Within two months of Bowling for Columbine being released in the United States, the Plaintiff began to receive hate mail. In one of the letters to the Plaintiff the author writes, "I recently saw the movie <u>Bowling for Columbine</u>. I just wanted to let you know that I think its sick that you could make those bombs and know that you were helping someone kill all those people, including young children."

32.  The Defendant has also committed defamation by implication against the Plaintiff by stating on the Oprah Winfrey show that McVeigh and Nichols

were in the thumb living there for a number of months and making practice bombs in preparation for Oklahoma City. The Defendant is clearly referring to the Plaintiff's farm, just as he did in Bowling for Columbine. This time the Defendant goes a step further. Rather than saying that the Plaintiff's farm is where Plaintiff, Terry Nichols and Timothy McVeigh made practice bombs *before* Oklahoma City, the Defendant says Plaintiff's farm is where they made practice bombs *in preparation of* Oklahoma City. This statement is false and necessarily implies that the Plaintiff was a co-conspirator in the Oklahoma City Bombing.

<u>FIRST CLAIM FOR RELIEF—LIBEL PER SE</u>

33.   Plaintiff realleges and incorporates by reference paragraphs 1 through 32 as if restated in full.

34.   The Defendant wrote, narrated, published and circulated or caused to be circulated the libelous statements concerning Plaintiff either with knowledge of the falsity of the statements or with reckless disregard for their truth.

35.   The statements made by the Defendant in Bowling for Columbine were so understood by those who heard the statements to have the defamatory meaning ascribed to it in this complaint and the Defendant intended his statements in Bowling for Columbine to be so understood by those who watched his movie.

36.   At the time the movie Bowling for Columbine was released to the public, the Defendant was in possession of evidence that would raise serious doubt about the truth of the statements made in Bowling for Columbine. The United

States government dismissed all charges against James Nichols in May of 1995. When the charges were dismissed against James Nichols the news made national and international headlines. Additionally, during his interview with the Plaintiff, the Defendant heard the Plaintiff deny that he had any involvement in the Oklahoma City Bombing. The Defendant carefully chose what portions of the interview with Plaintiff to include and which to exclude in an effort to portray Plaintiff as a criminal. He also chose to use portions of the criminal complaint against the Plaintiff but failed to use information about why the charges were dismissed. The information used by the Defendant amounted to an unfair account of the matter, with the Defendant implying that Plaintiff was culpable in the Oklahoma City Bombing but got away with it.

37. At the time the Defendant released his documentary movie, the Defendant failed to sufficiently investigate the truth of his statements. Thus, the Defendant lacked any substantial reason to believe the truth of the allegations he made against the Plaintiff in his documentary.

38. The defamatory statements were published with reckless disregard for the truth of the matter, and Defendant knew at the time the statements were formulated that they were false and injurious to the Plaintiff. The statements were intended by the Defendant to directly injure the Plaintiff's reputation and character.

39. The Defendant was also negligent in publishing the statements about the Plaintiff. With ordinary and reasonable care, the Defendant would have

realized, or could have discovered that the statements were obviously false and grossly libelous, offensive and damaging to Plaintiff.

40. As a legal result of the publication of these false statements, Plaintiff has suffered humiliation, shame, ostracism and mortification, all of his general damage in a sum to be proved at trial, but a sum not less than $10,000,000.

41. As a legal result of the publication of these false statements, Plaintiff has suffered severe emotional distress, all to his general damage, in a sum to be determined at trial.

42. By engaging in the malicious misconduct alleged above, the Defendant engaged in despicable conduct with the willful and conscious disregard for the rights of Plaintiff. The Defendant was aware of the probable dangerous consequences of his misconduct and willfully and deliberately failed to avoid these consequences, including subjecting Plaintiff to cruel and unjust hardship, in conscious disregard of Plaintiff's rights. Thus, an award of exemplary and punitive damages is justified.

43. The conduct of the Defendant was "despicable" within the meaning of the laws of the State of Michigan and malicious within the meaning of those laws, thus entitling the Plaintiff to exemplary and punitive damages from the Defendant.

### SECOND CLAIM FOR RELIEF—LIBEL PER SE

44. Plaintiff realleges and incorporates by reference paragraphs 1 through 43 as if restated in full.

45.    This statement by the Defendant on the Oprah Winfrey showed, quoted above at paragraph 18, was meant and intended to convey that Plaintiff was and is guilty of conspiring with Terry Nichols and Timothy McVeigh specifically by helping them make practice bombs to prepare them to carry out the Oklahoma City Bombing.

46.    The Defendant's statements accusing the Plaintiff of being complicit in the Oklahoma City Bombing are false. The Plaintiff was thoroughly investigated and all charges against him were dismissed.

47.    The Defendant's statements were meant and intended to hold Plaintiff in contempt in the eyes of the world.

48.    The Defendant acted with knowledge of the falsity of the statements made on the Oprah Winfrey show or with reckless disregard of their truth or falsity.

49.    The Defendant acted with actual malice in publishing and uttering the false statements about the Plaintiff. The Defendant's malice against the Plaintiff is evidenced by the comments he made on the Oprah Winfrey show immediately after he presented the clip featuring the Plaintiff, quoted above at paragraph 28.

50.    In doing this act, the Defendant intended to injure Plaintiff and deprive Plaintiff of his respect and dignity and to bring the Plaintiff into scandal, ridicule, shame and humiliation before his friends, neighbors, acquaintances and the public in general, and to hold Plaintiff up to public scorn, contempt, and disgrace.

51.    As a result of the malicious publication and dissemination of the information on the Oprah Winfrey show, the Plaintiff has been deprived of his basic human dignity by being falsely accused of being complicit in one of the most heinous crimes in United States history. Plaintiff has suffered a tremendous amount of embarrassment, humiliation, and mental agony and the Plaintiff has been held in contempt, calumny, distrust and ridicule.

52.    The conduct of the Defendant was "despicable" within the meaning of the laws of the State of Michigan and malicious within the meaning of those laws, thus entitling the Plaintiff to exemplary and punitive damages from the Defendant.

THIRD CLAIM FOR RELIEF—DEFAMATION BY IMPLICATION

53.    Plaintiff realleges and incorporates by reference paragraphs 1 through 52 as if restated in full.

54.    The Defendant has committed defamation by implication against the Plaintiff. The Defendant's narration of Bowling for Columbine as it pertained to the Plaintiff, as quoted above at paragraph 15, implied that the Plaintiff was a co-conspirator to the Oklahoma City Bombing.

55.    The Defendant has also committed defamation by implication against the Plaintiff by stating that, "the feds didn't have the goods on James, so the charges were dropped." This statement by the Defendant, particularly within the context of a documentary, presumes that there were goods to be delivered. The Defendant's statement implies that the Plaintiff was complicit in the Oklahoma City Bombing but that he got away with it. Within two months of

Bowling for Columbine being released in the United States, the Plaintiff began to receive hate mail from persons who had concluded from watching Bowling for Columbine that the Plaintiff was complicit in the Oklahoma City Bombing. As a direct consequence of Defendant's statements, the Plaintiff has been forced to relive the nightmare of being linked to the Oklahoma City Bombing. The first time the Plaintiff went through this nightmare was when the government falsely accused him of being complicit in the Oklahoma City Bombing. The government dismissed all of the charges against the Plaintiff over seven years ago. Now Plaintiff has been forced to relive this nightmare because the Defendant has maliciously leveled these charges against the Plaintiff all over again and with absolutely no evidence to support his false accusations against the Plaintiff.

56. As a legal result of the statements made by the Defendant in Bowling for Columbine, Plaintiff has suffered character assassination, loss of reputation, shame and mortification, all to his general damages in a sum not determined at this time, but in excess of $10,000,000.

FOURTH CLAIM FOR RELIEF—DEFAMATION BY IMPLICATION

57. Plaintiff realleges and incorporates by reference paragraphs 1 through 56 as if restated in full.

58. The Defendant has also committed defamation by implication against the Plaintiff by stating on the Oprah Winfrey show that McVeigh and Nichols were in the thumb living there for a number of months and making practice bombs in preparation for Oklahoma City. The Defendant is clearly referring

to the Plaintiff's farm, just as he did in Bowling for Columbine. This time the Defendant goes a step further. Rather than saying that the Plaintiff's farm is where Plaintiff, Terry Nichols and Timothy McVeigh made practice bombs *before* Oklahoma City, as he did in Bowling for Columbine, the Defendant says Plaintiff's farm is where they made practice bombs *in preparation of* Oklahoma City. This statement is absolutely false and necessarily implies that the Plaintiff was a co-conspirator in the Oklahoma City Bombing. This Oprah Winfrey show aired at least two times to date; once on November 1, 2002 and once on March 3, 2003.

59.  As a legal result of the statements made by the Defendant on the Oprah Winfrey show concerning Plaintiff, Plaintiff has suffered character assassination, loss of reputation, shame and mortification, all to his general damages in a sum not determined at this time, but in excess of $10,000,000.

### FIFTH CLAIM FOR RELIEF—FALSE LIGHT INVASION OF PRIVACY

60.  Plaintiff realleges and incorporates by reference paragraphs 1 through 59, as if restated in full.

61.  Defendant, without Plaintiff's consent, invaded Plaintiff's right to privacy by authoring, publishing, uttering and circulating or causing to be circulated the movie Bowling for Columbine, which falsely depicts Plaintiff as being a co-conspirator to the Oklahoma City Bombing, by specifically accusing Plaintiff of practicing to make bombs to prepare to bomb the Murrah Building in Oklahoma City with Terry Nichols and Timothy McVeigh.

62.    Defendant, without Plaintiff's consent, invaded Plaintiff's right to privacy by videotaping Plaintiff's bedroom and using the video footage of Plaintiff's bedroom in Defendant's motion picture.  At the time of the interview, the Defendant told Plaintiff that he would not videotape Plaintiff's bedroom.  The Defendant lied.

63.    The disclosure by the Defendant created publicity in the sense of a public disclosure to millions of people throughout the world as the Defendant released his movie in the United States and abroad.

64.    The publicity created by the Defendant placed Plaintiff in a false light in the public eye in that the statements made by the Defendant concerning Plaintiff in the movie were fabricated by the Defendant and publicly conveyed, and was intended to convey, a calculatedly false and inaccurate impression of Plaintiff as a criminal, who acted in a heinous and criminal manner by making practice bombs with Terry Nichols and Timothy McVeigh in order to carry out the second worst act of terrorism in the history of the United States.

65.    The publicity created by the Defendant's statements in Bowling for Columbine was highly objectionable to Plaintiff, and would be to any person of ordinary sensibilities.  The statements made Plaintiff the object of scorn and ridicule by many residents of Sanilac County, the State of Michigan, citizens of the United States, and in general people throughout the world, and was intended to and did directly injure the Plaintiff with respect to the Plaintiff's right to be left alone, as well as the Plaintiff's reputation, character and business.

66. The formulation, publication, and public dissemination of the statements in the movie made by the Defendant was done with actual malice in that it was done with all or some of Defendant's knowledge of the statements falsity, or in reckless disregard of the truth. At all relevant times the Defendant was aware, or should have been aware, of facts contrary to the Defendant's malicious allegations.

67. The publicity created by Defendant was done with malice in that it was made either with knowledge of the falsity of the statements or in reckless disregard of the truth. The statements describing Plaintiff's actions, character and intentions were calculated falsehoods.

68. The Defendant was also negligent in publishing the statements about the Plaintiff. With ordinary and reasonable care, the Defendant would have realized, or could have discovered, that the statements were obviously false and grossly libelous, offensive and damaging to Plaintiff.

69. As a legal result of the statements made by the Defendant in Bowling for Columbine concerning Plaintiff, Plaintiff has suffered character assassination, loss of reputation, shame and mortification, all to his general damages in a sum not determined at this time, but in excess of $10,000,000.

70. In making the disclosure described above, Defendant is guilty of "despicable" conduct amounting to oppression, fraud, or malice in that the Defendant made the disclosure with a willful disregard of Plaintiff's rights. Defendant's acts in formulating, publishing and disseminating the statements in Bowling for Columbine were done with the knowledge by the Defendant that these acts

would cause Plaintiff to suffer great humiliation, mental anguish and injury. Defendant's acts were therefore willful, wanton, intentional, and actually malicious and oppressive, justifying the award of exemplary and punitive damages according to proof at trial.

### SIXTH CLAIM FOR RELIEF—FALSE LIGHT INVASION OF PRIVACY

71. Plaintiff realleges and incorporates by reference paragraphs 1 through 70, as if restated in full.

72. Defendant, without Plaintiff's consent, invaded Plaintiff's right to privacy by falsely accusing the Plaintiff of a crime on the Oprah Winfrey show. The statements made by the Defendant immediately prior to introducing a clip of Bowling for Columbine that featured the Plaintiff, falsely depicted Plaintiff as being a co-conspirator to the Oklahoma City Bombing, by specifically accusing Plaintiff of practicing to make bombs to prepare to bomb the Murrah Building in Oklahoma City with Terry Nichols and Timothy McVeigh.

73. The disclosure by the Defendant created publicity in the sense of a public disclosure to millions of people throughout the world on national television.

74. The publicity created by the Defendant placed Plaintiff in a false light in the public eye in that the statements made by the Defendant concerning Plaintiff on the Oprah Winfrey show were fabricated by the Defendant and publicly conveyed, and was intended to convey, a calculatedly false and inaccurate impression of Plaintiff as a criminal, who acted in a heinous and criminal manner by making practice bombs with Terry Nichols and Timothy McVeigh

in order to prepare to carry out the second worst act of terrorism in the history of the United States.

75. The publicity created by the Defendant's statements on the Oprah Winfrey show was highly objectionable to Plaintiff, and would be to any person of ordinary sensibilities. The statements made Plaintiff the object of scorn and ridicule by many residents of Sanilac County, the State of Michigan, citizens of the United States, and in general people throughout the world, and was intended to and did directly injure the Plaintiff with respect to the Plaintiff's right to be left alone, as well as the Plaintiff's reputation, character and business.

76. The formulation, publication, and public dissemination of the statements on the Oprah Winfrey show made by the Defendant was done with actual malice in that it was done with all or some of Defendant's knowledge of the statements falsity, or in reckless disregard of the truth. At all relevant times the Defendant was aware, or should have been aware, of facts contrary to the Defendant's malicious allegations.

77. The publicity created by Defendant was done with malice in that it was made either with knowledge of the falsity of the statements or in reckless disregard of the truth. The statements describing Plaintiff's actions, character and intentions were calculated falsehoods.

78. The Defendant was also negligent in publishing the statements about the Plaintiff. With ordinary and reasonable care, the Defendant would have

realized, or could have discovered, that the statements were obviously false and grossly libelous, offensive and damaging to Plaintiff.

79. As a legal result of the statements made by the Defendant on the Oprah Winfrey show concerning Plaintiff, Plaintiff has suffered character assassination, loss of reputation, shame and mortification, all to his general damages in a sum not determined at this time, but in excess of $10,000,000.

80. In making the disclosure described above, Defendant is guilty of "despicable" conduct amounting to oppression, fraud, or malice in that the Defendant made the disclosure with a willful disregard of Plaintiff's rights. Defendant's acts in formulating, publishing and disseminating the statements on the Oprah Winfrey show were done with the knowledge by the Defendant that these acts would cause Plaintiff to suffer great humiliation, mental anguish and injury. Defendant's acts were therefore willful, wanton, intentional, and actually malicious and oppressive, justifying the award of exemplary and punitive damages according to proof at trial.

## SEVENTH CLAIM FOR RELIEF—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

81. Plaintiff realleges paragraphs 1 through 80 above, and incorporates them by reference.

82. Defendant's conduct in authoring, uttering, publishing and circulating or causing to be circulated the statements about the Plaintiff in Bowling for Columbine was intentional and malicious and done for the purpose of causing Plaintiff to suffer humiliation and mental anguish. Defendant's conduct in confirming and ratifying

these acts was done with knowledge that Plaintiff would suffer emotional distress and was done with a wanton and reckless disregard of the consequences to Plaintiff. Defendant's conduct as outlined above was extreme, outrageous and of such character as not to be tolerated by a civilized society.

83. Defendant's conduct as outlined above was for an ulterior motive or purpose.

84. The statements made by the Defendant in Bowling for Columbine about the Plaintiff clearly exposed Plaintiff to hatred, contempt, hate mail, ridicule and obloquy, because they falsely depicted Plaintiff as a co-conspirator in the Oklahoma City Bombing.

85. As a direct and proximate result of the Defendant's scandalous and outrageous acts, Plaintiff has suffered humiliation, mental anguish and emotional distress, all to Plaintiff's damage in an amount not less than $10,000,000.

86. Defendant's acts in formulating, publishing and disseminating or causing to be disseminated the statements he made against the Plaintiff in Bowling for Columbine were done with the knowledge by the Defendant that these acts would cause Plaintiff to suffer great humiliation, mental anguish and injury. Defendant's acts were, therefore, despicable conduct and so willful, wanton, intentionally and actually malicious and oppressive as to justify the award of exemplary and punitive damages.

EIGHTH CLAIM FOR RELIEF—INTENTIONAL INFLICTION OF EMOTIONAL
DISTRESS

87. Plaintiff realleges paragraphs 1 through 86 above, and incorporates them by reference.

88. Defendant's conduct in authoring, uttering, publishing and circulating or causing to be circulated the statements about the Plaintiff on the Oprah Winfrey show was

intentional and malicious and done for the purpose of causing Plaintiff to suffer humiliation and mental anguish. Defendant's conduct in confirming and ratifying these acts was done with knowledge that Plaintiff would suffer emotional distress and was done with a wanton and reckless disregard of the consequences to Plaintiff. Defendant's conduct as outlined above was extreme, outrageous and of such character as not to be tolerated by a civilized society.

89. Defendant's conduct as outlined above was for an ulterior motive or purpose.

90. The statements made by the Defendant on the Oprah Winfrey show about the Plaintiff clearly exposed Plaintiff to hatred, contempt, hate mail, ridicule and obloquy, because they falsely depicted Plaintiff as a co-conspirator in the Oklahoma City Bombing.

91. As a direct and proximate result of the Defendant's scandalous and outrageous acts, Plaintiff has suffered humiliation, mental anguish and emotional distress, all to Plaintiff's damage in an amount not less than $10,000,000.

92. Defendant's acts in formulating, publishing and disseminating or causing to be disseminated the statements he made against the Plaintiff in on the Oprah Winfrey show were done with the knowledge by the Defendant that these acts would cause Plaintiff to suffer great humiliation, mental anguish and injury. Defendant's acts were, therefore, despicable conduct and so willful, wanton, intentionally and actually malicious and oppressive as to justify the award of exemplary and punitive damages.

## NINTH CLAIM FOR RELIEF—NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

93. Plaintiff realleges paragraphs 1 through 92 above, and incorporates them by reference.

## JURY DEMAND

102. Plaintiff requests a trial by jury.

## PRAYER

Plaintiff requests judgment against Defendant as follows:

On the First Claim for Relief:

1. For general damages in excess of $10,000,000;

2. For special damages in an amount to be determined at trial, and for interest on this amount at the legal interest rate;

3. For punitive and exemplary damages in an amount to be determined at trial;

4. For costs of suit incurred; and

5. For any other and further relief that the court may deem just and proper.

On the Second Claim for Relief:

6. For general damages in excess of $10,000,000;

7. For special damages in an amount to be determined at trial, and for interest on this amount at the legal interest rate;

8. For punitive and exemplary damages in an amount to be determined at trial;

9. For costs of suit incurred; and

10. For any other and further relief that the court may deem just and proper.

On the Third Claim for Relief:

11. For general damages in excess of $10,000,000;

12. For special damages in an amount to be determined at trial, and for interest on this amount at the legal interest rate;

13. For punitive and exemplary damages in an amount to be determined at trial;

14. For costs of suit incurred; and

15. For any other and further relief that the court may deem just and proper.

On the Fourth Claim for Relief:

16. For general damages in excess of $10,000,000;

17. For special damages in an amount to be determined at trial, and for interest on this amount at the legal interest rate;

18. For punitive and exemplary damages in an amount to be determined at trial;

19. For costs of suit incurred; and

20. For any other and further relief that the court may deem just and proper.

On the Fifth Claim for Relief:

21. For general damages in excess of $10,000,000;

22. For special damages in an amount to be determined at trial, and for interest on this amount at the legal interest rate;

23. For punitive and exemplary damages in an amount to be determined at trial;

24. For costs of suit incurred; and

25. For any other and further relief that the court may deem just and proper.

On the Sixth Claim for Relief:

26. For general damages in excess of $10,000,000;

27. For special damages in an amount to be determined at trial, and for interest on this amount at the legal interest rate;

28. For punitive and exemplary damages in an amount to be determined at trial;

29. For costs of suit incurred; and

30. For any other and further relief that the court may deem just and proper.

On the Seventh Claim for Relief:

31. For general damages in excess of $10,000,000;

32. For special damages in an amount to be determined at trial, and for interest on this amount at the legal interest rate;

33. For punitive and exemplary damages in an amount to be determined at trial;

34. For costs of suit incurred; and

35. For any other and further relief that the court may deem just and proper.

On the Eighth Claim for Relief:

36. For general damages in excess of $10,000,000;

37. For special damages in an amount to be determined at trial, and for interest on this amount at the legal interest rate;

38. For punitive and exemplary damages in an amount to be determined at trial;

39. For costs of suit incurred; and

40. For any other and further relief that the court may deem just and proper.

On the Ninth Claim for Relief:

41. For general damages in excess of $20,000,000;

42. For special damages in an amount to be determined at trial, and for interest on this amount at the legal interest rate;

43. For punitive and exemplary damages in an amount to be determined at trial;

44. For costs of suit incurred; and

45. For any other and further relief that the court may deem just and proper.

On the Tenth Claim for Relief:

46. For punitive and exemplary damages in an amount to be determined at trial;

44. For the profits derived by Defendant from the unauthorized use of Plaintiff's name and
likeness;

45. For costs of suit incurred; and

46. For any other and further relief that the court may deem just and proper.

Dated: <u>October 27, 2003</u>                    Respectfully submitted,

                                                STEFANI C. GODSEY, PLLC

                                                Stefani C. Godsey, Attorney for Plaintiff

**Harpo Productions, Inc.**
P.O.Box 909715
Chicago, IL 60690



## BOWLING FOR COLUMBINE

### November 1, 2002

©2002 Harpo Productions Inc.
ALL RIGHTS RESERVED
Prepared by Burrelle's Information Services, which takes sole responsibility for accuracy of transcription. No license is granted to the user of this material other than for research. User may not reproduce any printed copy of the material except for user's personal or internal use and, in such case, only one copy may be printed, nor shall user use any material for commercial purposes or in any fashion that may infringe upon Harpo Productions, Inc.'s copyright or proprietary interests in the material.

Transcript produced by *Burrelle's Information Services*
Box 7 ● Livingston, New Jersey 07039

**Mr. MOORE:** You know, so they—no, they th—they think they're going to open up more accounts and—and, sadly, Oprah, they probably will when...

**WINFREY:** Yeah.

**Mr. MOORE:** ...when people learn that there's a free gun to get at this bank.

**WINFREY:** Well, if you think our gun violence is no different than other countries, you'll be shocked at this next clip. We're showing you the clips, but I'm hoping everybody will really go see the full movie. It's really something to talk about. You know how you come out of a movie and you go, `What did you think?' `I don't know. What did you think?' You'll have lots to think about when you come out of "Bowling for Columbine." But look—look at this clip.

*(Excerpt from "Bowling for Columbine")*

**WINFREY:** And Japan's a hundred twen—because I know people are saying, `Well, how many people are in those countries?'

**Mr. MOORE:** A hundred twenty million people in Japan, 39 gun murders. The—the equivalent for us would be we should have about 90 gun murders a year, not over 11,000.

**WINFREY:** Eleven thousand.

**Mr. MOORE:** And those are just the murders. There's 15,000 gun homi—suicides. There's 4,000 gun accidents. It adds up to about 30,000 people in America each year killed through gun violence.

**WINFREY:** Well, one thing that is astounding about this film, "Bowling for Columbine," is how people open up to Michael Moore. When we come back, the bizarre interview he had with James Nichols, the brother of Terry Nichols, who's serving life in prison for the Oklahoma City bombing. Was that a weird thing. Coming—come back. You'll get to see it. We'll be right back.

*(Announcements)*

*(Excerpt from "Bowling for Columbine")*

**WINFREY:** Oh, that—that her daughter is right there. That's really—that was a clip from a powerful new documentary called "Bowling for Columbine," which opens nationwide today. Michael Moore is the creator and director. The film confronts our obsession here in America with guns and violence, and those were members of a group called the Michigan Militia. How—did they just let you walk in there and...

**Mr. MOORE:** Yeah, yeah. They—they're very proud of what they do, and I think they believe that for every 10 people that see them in this or on your show, nine may not like them, but they—one will, and

--5--

their attitude is just keep showing the movie, and we'll pick up, you know, more support.

**WINFREY:** Uh-huh. I hear Timothy McVeigh and Terry Nichols reportedly once attended some of their meetings? That's what...

**Mr. MOORE:** Yes, that's correct. Yes, they did.

**WINFREY:** Yeah.

**Mr. MOORE:** Yeah. They—McVeigh and Nichols were in the thumb of Michigan living there for a number of months and making practice bombs and—in preparation for Oklahoma City.

**WINFREY:** And so Terry Nichols is serving a life sentence for the Oklahoma City bombing. Michael went to visit Terry Nichols' brother, James, who was also investigated for the bombing, but all the charges were dropped against him. This is one kind of bizarre interview. Did you think at the time it was bizarre? See, what I love about you is that you add such humor to it. You—in this movie, in "Roger & Me," the—the humor sort of breaks up the—the fact that we are really getting something out of this.

**Mr. MOORE:** Yeah, it also helps—it—it—it helps you from just—just going berserk...

**WINFREY:** Yeah.

**Mr. MOORE:** ...and—and thinking the whole thing has just gone insane and there's nothing you can do. Laughter is a means to, you know, help us move on, and—and I hope when people leave this film, because it is, on—on many levels, a very funny film...

**WINFREY:** Yeah.

**Mr. MOORE:** ...that they—that they leave not in despair but—but motivated to do something.

**WINFREY:** Yeah.

**Mr. MOORE:** And I think the—the humor helps do that.

**WINFREY:** Just thinking about—I know everybody's thinking about—we'll talk about that after the show. But anyway, look at this.

*(Excerpt from "Bowling for Columbine")*

**WINFREY:** Very good. So when you were in the room with him, he was waving the gun around and...

**Mr. MOORE:** Yeah, he was waving it around. The—the—the hammer was back. The—the bullets were in the chamber. I—I—I was really—I—I thought while I was in there, this is really stupid. I have—I have made a mistake.

**WINFREY:** When you said put the hammer back on or whatever—yeah, yeah.

**Mr. MOORE:** Yeah. And I'm—and I'm—this is—it's just a movie, you know? I mean, I want—I want to live, you know, and he—and then he puts it back carefully, hope—you know, and—but, you know—but—but—but

--6--

he—you know, he went to the high school next to mine, and—and I know a lot of guys like that. I mean, this is—this is, you know, where I grew up and...

**WINFREY**: And the interesting thing is he told you at the beginning of the interview, he starts out—he tells you he's a soybean farmer.

**Mr. MOORE**: Yes. Yeah. Yeah. He...

**WINFREY**: Makes tofu.

**Mr. MOORE**: He likes tofu.

**WINFREY**: Yeah.

**Mr. MOORE**: Yeah. And he's very into natural stuff, no chemicals, and I thought he was one of these back-to-the-earth kind of guys. And then the more that you—he opens up and reveals, you know, what he believes in, and—but the—but the scariest thing, I thought, of all that was that—that here's a guy, went—you know, grew up in the same educational district as I grew up in and he didn't know who Gandhi was.

**WINFREY**: Right.

**Mr. MOORE**: How can you go through an American education and not know about Gandhi or what Gandhi did? And I started to think more after I left that, you know, this gets to the core of what I really think the problem is. Yes, we have too many guns. But because we don't have a—a—a—a priority on education in this country and so many other things we—we allow a situation to get much worse.

**WINFREY**: A priority to educate and also what we are teaching.

**Mr. MOORE**: What—and what we're teaching, yeah.

**WINFREY**: Yeah, teaching, yeah.

**Mr. MOORE**: Like peace.

**WINFREY**: Like peace and values.

**Mr. MOORE**: And values, correct.

**WINFREY**: Tell us about your childhood. You're a member of the NRA.

**Mr. MOORE**: Yes, I was a—I was an Eagle Scout and a—I had a junior membership in the NRA. I won the NRA Marksman Award. And, you know, I grew up in an Irish Catholic household, loving parents. I had nuns in school and—and—and they—they taught us, I think, very important lessons, that we will be judged by how we treat the least among us. And—and we live in a time where that's—that's not our American ethic. Our ethic seems to be every man for himself. You know, pull yourself up by your bootstraps. Me, me, me, me, me.

**WINFREY**: Right.

**Mr. MOORE**: The ethic in—in these other countries is—is different.

**WINFREY**: Yeah.

**Mr. MOORE**: And I think that contributes to why we have more violence.

--7--

Case 2:03-cv-74313-PDB ECF No. 1 filed 10/27/03 PageID.34 Page 34 of 44



# CNN.com./ENTERTAINMENT

CNN Europe | CNN Asia | **Languages** | On CNN TV | Transcripts | Headline News | CNN International | About CNN.c

**SEARCH CNN.COM:**

- Home Page
- World
- U.S.
- Weather
- Business
- Sports
- Politics
- Law
- Technology
- Science & Space
- Health
- Entertainment
- Travel
- Education
- Special Reports


Get 4 FREE trial issues of TIME!
CLICK HERE

**SERVICES**
- Video
- Newswatch
- E-Mail Services
- CNN To Go

**SEARCH CNN.COM:**


## Michael Moore wants to tick you off

### Director's latest documentary is 'Bowling for Columbine'

Tuesday, November 5, 2002 Posted: 2:22 PM EST (1922 GMT)

**LOS ANGELES, California (AP) -- With George W. Bush facing midterm exams at the hands of voters, Michael Moore figures there's no better time for a fresh dose of his own left-wing politics.**

And after the sniper shootings that killed 10 around the nation's capital, Moore figures there's no better time for "Bowling for Columbine," his alternately hilarious and horrifying examination of America's gun violence.

The film's roots extend further back than Bush's election two years ago or the 1999 massacre at Columbine High School in Littleton, Colorado. Ask Moore, 48, how long the ideas have percolated and he recites a poem he wrote as a boy in Flint, Michigan, amid the 1960s race riots and Vietnam:

"Oh, what a wonderful world this would be,/If we all loved one another,/The riots would stop and the wars would end,/And we would all be brothers."

During the Detroit riots, Moore saw footage of people from white neighborhoods packing up their station wagons and fleeing. Coming out of Holy Thursday Mass on April 4, 1968, Moore heard someone call out that Martin Luther King Jr. had been shot, and a cheer went up from those leaving the church, he said.

"Now, when you are 13 and observing all this, it burned a hole right through my head, and it's never left me," Moore said in an interview. "So this has been with me a long time."

### Comedy about tragedy

Moore calls "Bowling for Columbine" a comedy about a tragedy. The film has made Moore's biggest splash since 1989's "Roger & Me," recounting his effort to confront

advertisemen
Your Loca
Showdow
Make CNN
It's Your T


Michael Moore

**Story Tools**
SAVE THIS   EMAIL THIS
PRINT THIS   MOST POPULAR

**RELATED**
- EW.COM: Review: Moore's 'Columbine' provocative
- Crossfire: Michael Moore takes on America's gun culture

General Motors boss Roger Smith over the collapse of the auto industry in Moore's home town.



**Moore buys bullets at a Canadian Wal-Mart in "Bowling for Columbine."**

After playing to acclaim at the Cannes and Toronto film festivals, "Bowling for Columbine" has packed commercial theaters since its mid-October debut. By election week, it will be in more than 100 U.S. cities, an unusually broad release for a documentary.

The title comes from the bowling class the two Columbine shooters attended the morning of their attack. Moore touches periodically on the Columbine tragedy, incorporating horrific security-camera footage of students hiding from the shooters and taking two Columbine survivors to the headquarters of Kmart, where the assailants obtained their ammunition, to ask the company to stop selling bullets.

But Moore takes a broader path, examining American history and imperialism, government's treatment of the poor and what he calls our culture of fear and anger.

The film describes Moore's upbringing as a National Rifle Association champion marksman. The story climaxes with Moore's bizarre audience with NRA leader Charlton Heston at the actor's home, an encounter Moore stumbled into after unsuccessfully seeking an interview through official channels.

Moore and his crew bought a Hollywood star map and went to the address listed for Heston. Figuring such maps were phony, Moore approached the intercom buzzer at the gate skeptically.

"Then ding-dong, and out of the box comes the voice of Moses," Moore said. "You can literally hear my voice shaking. I can't believe he's answering his own door. And I felt kind of bad about it, too. I don't really think you should go to somebody's home. I've never done that before. I didn't go to Roger Smith's home."

At Heston's request, Moore returned the next day. Their interview ends with Heston, flustered and annoyed, turning his back on Moore and walking away.

## 'He's not here to deliver roses'

Considering the guerrilla approach and left-wing principles of "Roger & Me" and Moore's television shows "TV Nation" and "The Awful Truth," it's surprising more people don't decline his interview requests. But Moore says that even as his style and politics have become better known, it's gotten easier to secure interviews.

"I wouldn't talk to me. Because I would think, if Michael Moore's coming to see me, it is not because I've just called 1-800-FLOWERS. He's not here to deliver roses," Moore said. "But people want to be on TV. You go up to Charlton Heston and say, 'I'm making a movie. I want you in my movie.' The seductive lure of that outweighs the negative possibilities."

Moore's methods often draw disapproval from intellectuals who consider his work frivolous and self-centered. The liberal-minded New Republic's review of Moore's best seller "Stupid White Men," an irreverent diatribe against the Bush

**66 I wouldn't talk to me. 99**

*-- Michael Moore on how he'd greet one of his own requests for*

administration, said Moore "does not write to inform. Attitude is all," and concludes that "if this book is what passes for a political manifesto, then Tom Paine is truly dead."

*an interview*

"What's strange is the liberals who go after me," Moore said. "There's this old cliche that liberals are the cops of the right. It's their job to police the political discourse, to make sure it doesn't go too far out on a limb. So they define the left as being just a little bit this side of center. Then everybody else is a lunatic out on some tree limb."

While Moore's left-wing politics are central to his work, he considers himself a filmmaker and storyteller more than an activist.

"The reason why so much political art doesn't work is because the artist puts the politics first and the art second. To me, it's the other way around. You'll never get people to think about the politics if your art sucks," Moore said.

"If I just wanted to make a political statement, I'd run for office. If I wanted to give a sermon, I'd go back to the seminary and be a priest. I'm here first and foremost to make sure I make a really good, funny, tragic movie."

Copyright 2002 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

**Story Tools**   SAVE THIS   EMAIL THIS   PRINT THIS   MOST POPULAR

## ENTERTAINMENT   ENTERTAINMENT NEWS

**President of '24,' man of the moment**



- Steve Martin behind gay 'Hart to Hart'
- Teen burns self with 'Jackass'-type stunt
- 'Northern Exposure's' Ruth-Anne dead

## TOP STORIES   cnn.com HOME PAGE

**Prince orders inquiry**

- Bush hints homeland security deal near
- U.S. officials: Iraq ordered gas antidote
- Hospital releases boy shot during sniper attacks

**SEARCH CNN.COM:** [ ] GO

© 2002 Cable News Network LP, LLLP.
An AOL Time Warner Company. All Rights Reserved.
Terms under which this service is provided to you.
Read our privacy guidelines. Contact us.

All external sites will open CNN.com does not endorse

Stefani C. Godsey, J.D.

**Stefani C. Godsey, P.L.L.C.**

P.O. Box 19207
Lansing, MI 48901
517-267-9957
Fax 517-372-7189
Email Godsey505@aol.com

November 26, 2002

BY FACSIMILE AND CERTIFIED
MAIL/RETURN RECEIPT REQUESTED
Mr. Michael Moore
c/o Andrew Hurwitz, Esq.
Epstein, Levinsohn, Bodine, Hurwitz & Weinstein
1790 Broadway
New York, New York 10019

Dear Mr. Moore:

Please be advised that I represent James Nichols, who you slandered in your recent documentary, "Bowling for Columbine." Specifically, you slander Mr. Nichols by stating, "On this farm they made practice bombs before Oklahoma City." The farm you are referring to is Mr. Nichols' farm, in Decker, Michigan, which you show in your documentary while making the statement. You also discuss the disposition of Terry Nichols and Timothy McVeigh's cases, and then further slander my client by stating, "The feds didn't have the goods on James, so they let him go." Also, on the November 1, 2002 Oprah Winfrey show, you display scenes from your documentary, featuring Mr. Nichols, and again state, "They were making practice bombs in preparation of Oklahoma City." Not only are these statements slanderous, they are slanderous per se because they falsely accuse my client of a crime.

Mr. Nichols was extensively investigated and ultimately cleared of any alleged wrongdoing relating to the Oklahoma City Bombing or any other matter. On August 10, 1995, before the Honorable Paul D. Borman, in the United States District Court for the Eastern District of Michigan, the Government dismissed all charges against Mr. Nichols.

Because of the seriousness of the slander involved, on behalf of Mr. Nichols, I demand that you not only stop repeating the slanderous act, but correct same in a manner calculated to inform all who have heard the slander. I further demand that "Bowling for Columbine" be immediately recalled and edited to, *both*, excise the slander and state an appropriate retraction. In order to be meaningful, a retraction must be published as extensively as the slander.

Please contact me within two weeks to confirm your response so that I may advise my client accordingly.

Sincerely,

Stefani C. Godsey

LAW OFFICES

# HONIGMAN MILLER SCHWARTZ AND COHN LLP

2290 FIRST NATIONAL BUILDING
660 WOODWARD AVENUE
DETROIT, MICHIGAN 48226-3583

FAX (313) 465-8000

HERSCHEL P. FINK
TELEPHONE: (313) 465-7400
FAX: (313) 465-7401
E-MAIL: hpf@honigman.com
www.honigman.com

LANSING, MICHIGAN
BINGHAM FARMS, MICHIGAN

December 23, 2002

Stefani C. Godsey, Esq.
Attorney at Law
P. O. Box 19207
Lansing, MI  48901

Re:     *James Nichols/"Bowling for Columbine"*

Dear Mr. Godsey:

I have now had an opportunity to more fully investigate the matters raised in your November 26, 2002 letter to Michael Moore regarding references to your client James Nichols in Mr. Moore's film "Bowling for Columbine."

Your letter complains of two passages in the motion picture, which you described as follows:

> Specifically, you slander Mr. Nichols by stating, "on this farm they made practice bombs before Oklahoma City." The farm you are referring to is Mr. Nichols' farm in Decker, Michigan, which you show in your documentary while making the statement. You also discuss the disposition of Terry Nichols and Timothy McVeigh's cases, and then further slander my client by stating, "The Feds didn't have the goods on James, so they let him go."

You also complain that Mr. Moore made substantially the same comments on the November 1, 2002 Oprah Winfrey show.

In fact, what follows are the relevant statements that were narrated by Mr. Moore in the movie:

> This is James Nichols. The brother of Terry Nichols. James graduated from high school the same year I did in the district next to mine. On this farm in Decker, Michigan, McVeigh and the Nichols brothers made practice bombs before Oklahoma City.

HONIGMAN MILLER SCHWARTZ AND COHN LLP

Stefani C. Godsey, Esq.
December 23, 2002
Page 2

> Terry and James were both arrested in connection with the
> bombing.
>
> * * *
>
> Terry Nichols was convicted and received a life sentence.
> Timothy McVeigh was executed. But the feds didn't have the
> goods on James, so the charges were dropped.

Based upon my review of court documents, including the federal criminal complaint against James Nichols and supporting affidavits, as well as newspaper stories at the time, it seems clear to me that the complained of statements narrated by Mr. Moore in the film are true, are matters of public record, and are further constitutionally protected and privileged under a number of overlapping defenses and privileges, including the opinion privilege and the rule of New York Times v. Sullivan, 376 US 254 (1964).

In an April, 1995 affidavit by FBI agent Patrick W. Wease, filed in support of the criminal complaint against James Nichols, agent Wease states in pertinent part:

> 3.   On April 21, 1995, JAMES DOUGLAS NICHOLS was
> interviewed in Decker, Michigan. JAMES NICHOLS further
> stated that he has observed MCVEIGH and TERRY NICHOLS
> making and exploding "bottle bombs" at his residence in 1992,
> using brake fluid, gasoline, and diesel fuel. JAMES NICHOLS
> further stated that he participated with MCVEIGH and TERRY
> NICHOLS in making "bottle bombs" in 1992, and that in 1994 he,
> JAMES NICHOLS, has made small explosive devices using
> prescription vials, pyrodex, blasting caps, and safety fuse.
>
> * * *
>
> 5.   An interview conducted on April 21, 1995, with Daniel
> Stomber, 5896 Deckerville Road, Evergreen Township, Decker,
> Michigan, reveals that he was present at the farm of JAMES
> NICHOLS on several occasion when JAMES NICHOLS and
> TERRY NICHOLS manufactured small explosive devices.
> Stomber explained that the Nichols brothers would mix fertilizer,
> peroxide, and bleach in plastic pop bottles and detonate them
> around the Nichols farm. Stomber recalls JAMES stating, "We're
> getting better at it" when he referred to the bombmaking.
>
> * * *

Honigman Miller Schwartz and Cohn LLP

Stefani C. Godsey, Esq.
December 23, 2002
Page 3

8.    On April 21, 1995, Paul Isydorak, a neighbor of JAMES NICHOLS was interviewed. Isydorak stated that JAMES NICHOLS was always "fooling around" with common household materials to determine what type of explosive value they had. Isydorak specifically recall Nichols mentioning ammonia as one of the experimental substances.

* * *

9.    On April 21, 1995, Isydorak visited a local bar with JAMES NICHOLS. He overheard JAMES in a conversation with the bartender in which James explained that different types of explosives are used to create different type of explosive effects.

* * *

12.    NICHOLS explained that they had been having fun making cardboard bombs.

Another affidavit supporting the criminal complaint against James Nichols by FBI agent Henry C. Gibbons adds:

11.    A relative of James Nichols reports to the FBI that Tim McVeigh is a friend and associate of James Nichols, who has worked and resided at the farm on North Van Dyke in Decker …. This relative further reports that she had heard that James Nichols had been involved in constructing bombs in approximately November 1994, and that he possessed large quantities of fuel oil and fertilizer.

Of course, in the film itself Mr. Nichols confirms to Mr. Moore much the same:

MICHAEL

So they didn't find anything on this farm?

NICHOLS

As to what? Bomb-making material?

MICHAEL

Any kind of explosives.

HONIGMAN MILLER SCHWARTZ AND COHN LLP

Stefani C. Godsey, Esq.
December 23, 2002
Page 4

### NICHOLS

> Uh, yeah. I had blasting caps, dynamite blasting caps, uh dynamite
> fuse, uh, black powder, you know, for muzzle loaders. Sure Diesel
> fuel fertilizer. But uh that is normal farm stuff. That is no way
> connected in anyway what-so-ever to the Oklahoma City bombing
> or bomb making.

Not only is the statement in the film that "the Nichols brothers made practice bombs before Oklahoma City" on the Decker farm literally true, it is also a matter of public record, and therefore privileged under Michigan's "official reports" statute (while reference is made to Michigan law throughout, the law of almost every jurisdiction is similar, since all are dictated by the First Amendment and Supreme Court case law). MCL §600.2911 (3) provides:

> Damages shall not be awarded in a libel action for the publication
> or broadcast of a fair and true report of matters of public record, a
> public and official proceeding, or of a governmental notice,
> announcement, written or recorded report or record generally
> available to the public, or act or action of a public body, or for a
> heading of the report which is a fair and true headnote of the
> report.

The applicable law confers considerable latitude upon speakers in discussing public affairs, and requires only "substantial," not literal, accuracy. So long as the "gist" or "sting" of the alleged libel has been accurately reported and a literally accurate account would have no appreciably different effect on the recipient, the account will not be actionable. *Rouch v Enquirer & News of Battle Creek (After Remand)*, 440 Mich 238, 258-260 (1992). See, also, *McCracken v Evening News Association*, 3 Mich App 32 (1966), *Koniak v Heritage Newspaper (After Remand)*, 190 Mich App 577 (1993) *lv den*, 508 NW2d 500 (1993), *Fisher v Heritage Newspapers*, 158 Mich App 409 (1987), *lv den*, 428 Mich 914 (1987), *Butcher v Heritage Newspapers*, 190 Mich App 309 (1991), *lv den*, 439 Mich 89 (1991).

More recently, the Court of Appeals again affirmed summary disposition for a media defendant in a libel case arising from reports about public statements by the Detroit Police Department. In *Northland Wheels Roller Skating Center v Detroit Free Press*, 213 Mich App 317 (1995), the Court of Appeals interpreted the scope of the then recently expanded official reports privilege contained in MCL §600.2911(3). The Court found the privilege to be expansive, including not only official reports, but even press releases and statements by public agencies and officials. 213 Mich App at 327. The Court of Appeals also affirmed that "fair and true" in the statute means only that the report need be substantially accurate, and that a literally accurate account would produce the same effect in the mind of the reader or viewer.

HONIGMAN MILLER SCHWARTZ AND COHN LLP

Stefani C. Godsey, Esq.
December 23, 2002
Page 5

Most recently, in *Collins v Detroit Free Press*, 245 Mich App 27 (2001), the Court of Appeals again emphasized that "for purposes of establishing a prima facie case of defamation, a 'statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced,'" (Quoting from *Mason v New Yorker Magazine*, 501 US 496, 517 (1991).) 244 Mich App at 34.

Case law also establishes that the defendant need not have even seen or relied upon the official report to be entitled to the protection of the privilege. *McCracken v Evening News Association, supra*.

Apart from the privilege that applies to reports based upon matters of public record, James Nichols clearly also fits the category of a "public figure" under the *New York Times* rule. Not only would he qualify for public figure status by virtue of his connection to the Oklahoma City bombing, he has also actively injected himself into a public controversy by publicly defending his brother, accusing the government of a conspiracy and cover-up, and even by co-authoring a book with Bob Papovich arguing Timothy McVeigh's cause. A casual internet search of news sites returns numerous news stories in which James Nichols injects himself actively into the Oklahoma City controversy.

"The classification of a plaintiff as a public or private figure is a question of law to be determined initially by the trial court and then carefully scrutinized by an appellate court." *Marcone v Penthouse*, 754 F2d 1072, 1081 n 4 (3rd Cir. 1985), *cert den*, 106 SCt 182 (1985). Similarly, *Lins v Evening News Assoc.*, 129 Mich App 419, 431-432 (1983).

While public figures are not totally barred from suing for defamation, their right to do so was sharply limited by the *New York Times* decision and numerous subsequent cases so that debate on public issues would have sufficient "breathing room" and be "uninhibited, robust and wide-open."

The constitutional requirement for a public figure plaintiff to state a claim for libel requires proof by *clear and convincing evidence* that the speaker had actual knowledge of falsity or ". . . in fact entertained serious doubts as to the truth of his publication," *St. Amant v Thompson*, 390 US 727, 731 (1968), or had a "high degree of awareness of probable falsity." *Garrison v Louisiana*, 379 US 64, 74 (1964). Later in *Bose v Consumers Union of the U.S., Inc.*, 466 US 485, 511 (1984), the Supreme Court restated the meaning of actual malice:

> The burden of proving "actual malice" requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement.

466 US at 511, n 30.

HONIGMAN MILLER SCHWARTZ AND COHN LLP

Stefani C. Godsey, Esq.
December 23, 2002
Page 6

Michigan decisions are, of course, in accord.  In *Gaynes v Allen*, 128 Mich App 42 (1983), the Michigan Court of Appeals held:

> In order to satisfy the "reckless disregard" test of actual malice, plaintiff was required to present evidence that the article was published with a high degree of awareness of probable falsity and that defendants in fact entertained serious doubts as to the truth of the matters published.  *Garrison v Louisiana*, 379 US 64, 74; 855 SCt 209; 13 L Ed 125 (1964); *St. Amant v Thompson*, 390 US 727, 731; 88 SCt 1323; 20 L Ed 262 (1968).

128 Mich App at 52.

"The test laid down in *New York Times* is not keyed to ordinary care; defeasance of the privilege is conditioned, not on mere negligence, but on reckless disregard for the truth." *Garrison v. Louisiana*, 379 US 64, 79 (1964); *New York Times v. Sullivan*, 376 US 254, 288 (1964).  Failure to investigate or investigate fully does not amount to reckless disregard. *St. Amant v. Thompson*, 390 US 727, 731 (1968); *Casono v. WDSU-TV*, 474 F. 2d 3 (9th Cir. 1972). There is no requirement that the speaker seek out plaintiff's version of a dispute. *Championship Sports v. Time, Inc.*, 336 NYS 2d 958, 960 (1972).  Nor is there a requirement that a subject be placed in the best possible light, *McIntire v. Westinghouse Broadcasting Co.*, 479 F. Supp. 808, 811 (D Miss, 1979), or to even provide a fair and objective account, *Weingarten v. Block*, 102 Cal App 3d 129, 162 Cal Rptr 701 (1980).  A sensational account "does not establish malice with convincing clarity." *Bandelin v. Pietsch*, 563 P 2d 395, 400 (Idaho, 1977), *cert den.* 434 US 891. Factual inaccuracies obviously do not by themselves amount to "reckless disregard." *Fadell v. Minneapolis Star & Tribune Co.*, 557 F. 2d 107, 109 (7th Cir., 1977), *cert den* 434 US 966; nor errors in interpretation, *Time, Inc. v. Pape*, 401 US 279 (1971), nor even speculative and sloppy research, *Oliver v. Village Voice, Inc.*, 417 F. Supp. 235, 238 (SDNY, 1976).  A defendant has no constitutional obligation to verify everything published. *Washington Post Co. v. Keogh*, 365 F. 2d 965, 972 (D.C. Cir., 1966), *cert den*, 385 US 1011 (1967).  Reliance on a single source in the absence of a high degree of awareness of probable falsity, is also warranted. *New York Times Co. v. Connor*, 365 F. 2d 567, 576 (6th Cir., 1966).  An "adversarial stance" toward the plaintiff by the reporter is similarly not evidence of actual malice. *Tavoulareas v. Piro*, 817 F. 2d 762, 795-96 (DC Cir., *en banc*), *cert denied*, 484 US 870 (1987).  Publication of a statement in the face of plaintiff's vehement denials does not demonstrate actual malice. *Harte-Hanks Communications v. Connaughton*, 491 US 657, 692 n 37 (1989).

Even if there were false statements of fact about James Nichols in "Bowling for Columbine" - - which is not the case - - there is no suggestion whatsoever that Mr. Moore had any conscious awareness of their falsity.  As such, any false statements would be privileged and unactionable.

HONIGMAN MILLER SCHWARTZ AND COHN LLP

Stefani C. Godsey, Esq.
December 23, 2002
Page 7

You further take issue with Mr. Moore's indisputably true statement that "the feds didn't have the goods on James, so the charges were dropped." At most, Mr. Moore's language may have been hyperbolic, but that is a hallmark of opinion, another privilege recognized under the First Amendment. Highly opinionated speakers, such as Mr. Moore, are considered by the courts to be the very essence of constitutionally protected opinion, in the same category as newspaper editorial columnists. *Garvelink v Detroit News*, 206 Mich App 604, 611 (1994) ("The appearance on an editorial page clearly indicates to any reader that the opinions of the writer will be reflected in the column as opposed to only facts"); *Royal Palace Homes v Channel 7 of Detroit*, 197 Mich App 48, 51 n. 1 (1992) ("an expression of opinion is constitutionally protected"); *Milkovich v Loraine Journal*, 497 US 1, 6, 17 (1990) (First Amendment protects "statements that cannot reasonably [be] interpreted as stating actual facts about an individual. This provides assurances that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the disclosure of our nation.").

Statements in the movie to the effect that "the feds didn't have the goods on James" are pure opinions or rhetorical hyperbole, and are fully privileged and protected under the First Amendment.

In sum, the motion picture "Bowling for Columbine" contains no false statement of fact about James Nichols, and the film is fully protected under overlapping First Amendment based privileges.

The purpose of this rather expansive exposition on defamation law is to prevent you from proceeding with a lawsuit which would be clearly unsustainable and frivolous, perhaps in violation of your obligations under FRCP 11 or MCR 2.114.

Very truly yours,

HONIGMAN MILLER SCHWARTZ AND COHN

By: _____
Herschel P. Fink

HPF:dph