UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES D. NICHOLS,

          Plaintiff,                    CASE NO. 03-74313

-vs-                           PAUL D. BORMAN
                                 UNITED STATES DISTRICT JUDGE

MICHAEL MOORE,

          Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## BACKGROUND:

Presently before the Court is Michael Moore's ("Defendant") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff James Nichols' Complaint, filed on October 27, 2003, contains the following counts:

| | |
|---|---|
| Count I | Libel Per Se (based upon Defendant's film, "Bowling for Columbine"("the Film")) |
| Count II | Libel Per Se (based upon Defendant's appearance on the "Oprah Winfrey Show") |
| Count III | Defamation by Implication (based upon the Film) |
| Count IV | Defamation by Implication (based upon the Oprah Winfrey Show) |
| Count V | False Light Invasion of Privacy (based upon the Film) |
| Count VI | False Light Invasion of Privacy (based upon the Oprah Winfrey Show) |
| Count VII | Intentional Infliction of Emotional Distress (based upon the Film) |

1

| Count VIII | Intentional Infliction of Emotional Distress (based upon the Oprah Winfrey Show) |
| Count IX | Negligent Infliction of Emotional Distress |
| Count X | Right of Publicity |

(Complaint).

On September 3, 2004, this Court granted in part and denied in part Defendant's Motion for Summary Judgment. The Court dismissed Counts II, IV, VI, VIII and X. The following Counts remain pending:

| Count I | Libel Per Se (based upon the Film) |
| Count III | Defamation by Implication (based upon the Film) |
| Count V | False Light Invasion of Privacy (based upon the Film) |
| Count VII | Intentional Infliction of Emotional Distress (based upon the Film) |
| Count IX | Negligent Infliction of Emotional Distress |

As set forth in the Court's September 3, 2004 Opinion and Order, on October 28, 2002, the movie Bowling for Columbine premiered in Flint, Michigan, near Decker, the hometown of Plaintiff. (Complaint, ¶5). The Film is a documentary which explores guns and violence in America. James Nichols ("Plaintiff") bases his lawsuit on a film segment on the bombing of the Federal Building in Oklahoma City, for which Plaintiff's brother Terry Nichols and Timothy McVeigh were arrested and convicted.

Shortly after the Oklahoma City bombing, Plaintiff was arrested on a charge of possession of explosive devices on his farm in Decker, Michigan. He was first detained, and then released on bond. (Plaintiff's Response, Ex. 6). Plaintiff was also held as a material witness to the bombing. (*Id.* Ex. 4). Subsequently, the government dismissed the criminal charges against Plaintiff James Nichols due to a lack of incriminating evidence. (*Id.* Ex. 12).

2

As to that portion of the Film dealing with the Oklahoma City bombing, Defendant had interviewed Plaintiff at his home in Decker, Michigan.  The interview lasted approximately three hours; Defendant incorporated approximately ten minutes of the interview into the Film. (Defendant's Motion, Ex. J).

Defendant conducted an ongoing narration throughout the Film.  The text and sequence of Defendant's statements made in the film, pertinent instantly, are as follows:

(1)     ... when on April 19, 1995 two guys living in Michigan who had attended Militia meetings, Timothy McVeigh and Terry Nichols, blew up the federal building in Oklahoma City killing 168 people.

(2)     On this farm in Decker, Michigan, McVeigh and the Nichols brothers made practice bombs before Oklahoma City.

(3)     Terry and James were both arrested in connection to the bombing.

(4)     (female voice over) U.S. Attorneys formally linked the Nichols brothers of Michigan with Oklahoma bomb suspect, Timothy McVeigh.

(5)     Officials charged James, who was at the hearing, and Terry, who was not, with conspiring to make and possess small bombs.

(6)     Terry Nichols was convicted and received a life sentence.  Timothy McVeigh was executed.  But the feds didn't have the goods on James, so the charges were dropped.

(Plaintiff's Response, Ex. 14).

On February 25, 2005, Defendant filed the instant Motion for Summary Judgment.

Plaintiff responded on May 9, 2005 and Defendant replied on May 11, 2005.[1]

**ARGUMENTS**

---

[1]Plaintiff and Defendant re-filed their respective Response and Reply after their previous motions were stricken by the Court because they violated the Local Rules of the Eastern District of Michigan.

### 1.    Defendant's Argument

Defendant argues that his statements are not actionable because they are substantially true accounts of public records and reliable news reports.  (Defendant's Motion, at 4). Defendant further argues that the statements are not defamatory because Plaintiff is a public figure and there is no evidence of actual malice.  (*Id.* at 11).  Defendant also argues that Plaintiff's defamation by implication claims fails because Plaintiff cannot overcome the constitutional hurdles for such a claim, and that there were no material factual omissions in the film.  (*Id.* at 17).  Lastly, Defendant contends that Plaintiff's false light and emotional distress claims fail because they are subject to the same constitutional restraints as his defamation claim. (*Id.* at 19).

### 2.    Plaintiff's Argument

Plaintiff contends that the statements at issue were false.  (Plaintiff's Response, at 13). Plaintiff further contends that Plaintiff is not a limited purpose public figure, but if the Court were to find otherwise, Plaintiff has met the actual malice standard.  (*Id.* at 15-16).  Lastly, Plaintiff contends that even if Defendant's statements were true, Defendant defamed Plaintiff by implication given the context and totality of the film.  (*Id.* at 18).

## ANALYSIS

### A.  Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof."  Fed. R. Civ. P. 56(b).  Summary judgment is appropriate where the moving party demonstrates that there

4

is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd.*

5

*of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see also Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

Summary judgment is particularly appropriate at an early stage in cases where claims of libel or invasion of privacy are made against publications dealing with matters of public interest and concern. "In recognition of the constitutional privilege of free expression secured by the First and Fourteenth Amendments, the courts in libel actions have recognized the need for affording summary relief to defendants in order to avoid the 'chilling effect' on freedom of speech and press." *Ireland v. Edwards*, 230 Mich. App. 607, 613, n. 4 (1998)(quoting *Lins v. Evening News Ass'n*, 129 Mich. App. 419, 425 (1982)).

**B.     Discussion**

**1.     Were Defendant's Statements Substantially True?**

Defendant first argues that his statements were literally true, and substantial truth is an absolute defense in an action for defamation. Truth is an absolute defense to an action for defamation, regardless of the speaker's motivation. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 770 (1986). The Court finds that "truth" means substantial truth, as the Michigan Court of Appeals has set forth [i]f the gist, the sting, of the [statement] is substantially true, the defendant is not liable." *Fisher v. Detroit Free Press,* 158 Mich. App. 409, 414 (Mich. App. 1987). "[L]iability should not be imposed for slight inaccuracies. Rather, the Court must examine the sting of the article and its affect on the reader. Minor differences are deemed immaterial." *Duran v. Detroit News,* 200 Mich. App. 622, 633 (Mich. App. 1993).

Michigan law also provides that damages will not be allowed in a libel action for a fair and true report of matter of public record. MCL §600.2911(3) provides:

6

Damages shall not be awarded in a libel action for the publication or broadcast of a fair and true report of matters of public record, a public and official proceeding or of a governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body, or for a hearing of the report which is a fair and true headnote of the report.

(MCL §600.2911(3)).

The text and sequence of Defendant's statements made in "Bowling For Columbine" are

as follows:

(1)     ... when on April 19, 1995 two guys living in Michigan who had attended Militia meetings, Timothy McVeigh and Terry Nichols, blew up the federal building in Oklahoma City killing 168 people.

(2)     On this farm in Decker, Michigan, McVeigh and the Nichols brothers made practice bombs before Oklahoma City.

(3)     Terry and James were both arrested in connection to the bombing.

(4)     (female voice over) U.S. Attorneys formally linked the Nichols brothers of Michigan with Oklahoma bomb suspect, Timothy McVeigh.

(5)     Officials charged James, who was at the hearing, and Terry, who was not, with conspiring to make and possess small bombs.

(6)     Terry Nichols was convicted and received a life sentence.  Timothy McVeigh was executed.  But the feds didn't have the goods on James, so the charges were dropped.

(Plaintiff's Response, Ex. 14).  Defendant claims that each of these statements were true.

The accuracy of the contested statements set forth above is examined below.

**a.     "McVeigh and the Nichols brothers made practice bombs before Oklahoma City....Officials charged James, who was at the hearing, and Terry, who was not, with conspiring to make and possess small bombs."**

Defendant contends that McVeigh and the Nichols brother did make practice bombs on

Nichols' farm before the Oklahoma City bombing.  Attached to the Amended Criminal

7

Complaint against James Nichols, FBI Agent Patrick W. Wease stated in an affidavit:

> On April 21, 1995, JAMES DOUGLAS NICHOLS was interviewed in Decker,
> Michigan.  During this interview, JAMES NICHOLS stated that he is the brother of
> TERRY NICHOLS and is a friend of TIMOTHY MCVEIGH, and that both have visited
> and/or resided with him at his farm in Decker, Michigan, over the past several years.
> JAMES NICHOLS further stated that he has observed MCVEIGH and TERRY
> NICHOLS making and exploding 'bottle bombs' at his residence in 1992, using brake
> fluid, gasoline, and diesel fuel.  JAMES NICHOLS further stated that he participated
> with MCVEIGH and TERRY NICHOLS in making 'bottle bombs' in 1992, and that in
> 1994, he JAMES NICHOLS, has made small explosive devices using prescription vials,
> pyrodex, blasting caps, and safety fuse.

(Defendant's Motion, Ex. B ¶3).

Plaintiff argues that the affidavits of FBI agents filed with the Court are hearsay and "do

not establish, as a matter of law, the truth of the specific statements at issue with this case."

(Plaintiff's Response, at 13).  The Court finds that Plaintiff is correct in that these statements do

not establish as a matter of law that Defendant's statements were true.  On the other hand, the

Court finds that these affidavits are part of the public record and are probative of the statements'

veracity.[2]  The Court stresses that it is the Plaintiff's burden to prove falsity.  As the Michigan

---

[2]The Court notes that Defendant presumes that the eight newspaper articles produced by
Defendant during discovery provide the sole basis for Defendant's statements in the film.  The
Defendant in response to Plaintiff's interrogatory request produced eight articles gathered by his
production staff during their fact-checking process for the film.  In Defendant's response to the
interrogatory request, he provided:

> Moore objects to this interrogatory as irrelevant, unduly burdensome, and not designed to
> lead to the discovery of relevant evidence to the extent that it requests the 'full factual
> basis' of the quoted statement ['McVeigh and the Nichols brother made practice bombs
> before Oklahoma City], given that much of the evidence for the quoted statement is in the
> public domain and was reported in innumerable media outlets.  Moore objects, and
> declines to comply with, the request to produce information that is in the public domain
> and therefore equally accessible to Moore and Nichols.  Subject to and without waiving
> these objections, Moore states that the attached documents, which comprise factual
> assertions made in 'Bowling for Columbine' and supporting news articles, provide
> factual support for the statement at issue in this interrogatory.

8

Court of Appeals has provided, in a defamation case, "the constitution requires that the plaintiff bear the burden of proving falsity." *Royal Palace Homes v. Channel 7 of Detroit, Inc.,* 197 Mich. App. 48, 52 (Mich. App. 1993). The Court further notes that Defendant is not required to consult the public record before making his statements, it is sufficient that the public record is consistent with them. As the Court provided in *McCracken v. Evening News Association,* 3 Mich. App. 32 (1966) in discussing MCL §600.2911(3), *see supra,* as follows:

> [t]he statute protects newspaper publishers if the article is a fair and true report of the public and official proceeding. The fact that the reporter herein relied on the word of another as to the nature of the complaint and warrant is immaterial. The statute does not command the reporter to obtain his information from the official court records.

(*Id.* at 39).

---

(Defendant's Reply, Ex. O). The Plaintiff contends that if Defendant relied on the attached articles, then he knew at the time:

> a.) that James Nichols was originally detained as a material witness, and thereafter held on Michigan charges, which had nothing to do with the Oklahoma City bombing; b.) that James Nichols was <u>never</u> arrested in connection to the Oklahoma City bombing; c.) that the Michigan charges of conspiracy to make and possess 'small bombs' were unrelated to the Oklahoma City bombing; and d.) that the Michigan charges dropped by the feds also were totally unrelated to the Oklahoma City bombing.

(Plaintiff's Response, at 6). Defendant testified as follows regarding what reports he relied on regarding Plaintiff's arrest:

> A. You know, it's been so many years at this point, I can't remember at that time the specific things that I read, but it was a variety of things from articles in the 'Los Angeles Times' to the 'Washington Post' to the 'Detroit Free Press,' news reports from the Detroit TV stations, the Flint TV stations, books, magazine articles. I mean it would be impossible at this point to remember the specifics of all of that.

(Defendant's Dep. at 24-5). The Court finds that the articles produced by Defendant are relevant, however, the Court does not find that Defendant relied on these articles as the sole source for his statements.

The Amended Criminal Complaint also referenced several sources which described Plaintiff making bombs.  (*Id.* ¶¶5,12).  Further, Magistrate Judge Virginia M. Morgan entered an Order of Detention Pending Trial in which she found by clear and convincing evidence that Plaintiff experimented with explosive materials.  (*Id.* Ex. E).   The Fox News show The Edge With Paula Zahn ran the following on May 2, 2001:

> Unidentified Male Correspondent (voiceover): Terry Nichols was not in Oklahoma City on April 19th, 1995.  But just two days after the bombing, federal agents raided the Nichols's farm in Decker, Michigan.  The government knew Timothy McVeigh and Terry Nichols were old Army buddies and knew the two had played with explosives on the farm.  James Nichols calls it child's play.
>
> James Nichols, Terry Nichols's Brother: Terry and I used dynamite for blowing stumps and blowing ditches, you know, years and years ago.

(*Id.* Ex. I).

Plaintiff claims that he did not experiment with bomb making materials, but that by his "silence, by not talking, not objecting" he agreed with those reports that contended that he did. (Plainitff's Dep. at 95).   The Court finds that the assortment of public record sources were sufficient for Defendant to draw the conclusion that Plaintiff, along with McVeigh and Terry Nichols made practice[3] bombs on Nichols' farm "before Oklahoma City."

Further, the Court finds that Plaintiff was charged with conspiring to make and possess

---

[3]For the instant purposes, there is no meaningful difference between the words "experiment" and "practice."  The Webster's II New Riverside University Dictionary defines "experiment" as "1. A test performed to demonstrate a known truth, examine the validity of a hypothesis, or ascertain the efficacy of something untried. 2. The conducting of a test." (Webster's II New Riverside University Dictionary at 454 (1988).  The Webster's II New Riverside University Dictionary defines "practice" in this context as "2. To perform or exercise repeatedly in order to acquire or perfect a skill. 4. To work at."  (*Id.* at 923).  The Court notes that the Michigan Court of Appeals in *Collins v. Detroit Free Press,* 245 Mich. App. 27 (Mich. App. 2001) held that a newspaper report that quoted plaintiff as saying "I hate" the white race was a substantially accurate account of the actual statement "I don't like the white race."

small bombs, therefore the second part of Defendant's statement stating this was true.  In the

1995 Federal criminal prosecution of Plaintiff, *United States v. James Nichols*, CR# 95-80361,

he was charged in a Federal Grand Jury Indictment, *inter alia*, with: Count I – Conspiracy to

Possess Unregistered Firearms.  This Count stated that part of the unlawful conspiracy was that

"the co-conspirators would manufacture destructive devices on Nichols' farm in Decker,

Michigan."  The "overt acts" included:

> 2.      In approximately 1992, James Nichols, Terry Nichols and Timothy McVeigh
> experimented in the manufacture and detonation of destructive devices made
> up of readily available materials such as brake fluid and diesel fuel.

(Indictment, p. 2).  Thus, the Court finds that Defendant's statement that Plaintiff was charged

with conspiring to make small bombs with Terry Nichols and Timothy McVeigh is also an

accurate statement.

### b.      "Nichols was arrested in connection to the Oklahoma City Bombing"

As noted above, in Plaintiff's 1995 Federal criminal prosecution, he was charged in a

Federal Grand Jury Indictment, *inter alia*, with: Count I – Conspiracy to Possess Unregistered

Firearms.  This Count stated that part of the unlawful conspiracy was that "the co-conspirators

would manufacture destructive devices on Nichols' farm in Decker, Michigan."  The "overt acts"

included:

> 2.      In approximately 1992, James Nichols, Terry Nichols and Timothy McVeigh
> experimented in the manufacture and detonation of destructive devices made
> up of readily available materials such as brake fluid and diesel fuel.

(Indictment, p. 2).

The Court finds that this is the most troublesome of Defendant's statements because the

prosecution's charges did not contain any allegations that Plaintiff participated in the bombing.

11

On the other hand, Defendant did not state that Plaintiff was charged with or accused of participating in the bombing.  Defendant provided that Plaintiff was "arrested in connection to the Oklahoma City bombing."  This is an important distinction.  The word "connection" conveys a relationship or association, and Plaintiff's arrest was clearly associated or related to the Oklahoma City bombing.  If there was no Oklahoma City bombing, it is a fair assumption that Plaintiff would not have been charged by federal prosecutors.

The Court notes that Plaintiff has all but admitted that he was arrested in connection to the Oklahoma City bombing.  Plaintiff also said during an interview between he and Defendant (which was edited out of Bowling for Columbine) "I don't know if I was arrested or not but I was thrown in prison.  Federal prison in April of 95.  What for?  I said for that Oklahoma bombing thing."  (*Id.* Ex. J).

Plaintiff was also held as a material witness in connection with the Oklahoma City bombing.  Plaintiff testified to this as follows in his deposition:

Q.  Were you arrested in connection with the Oklahoma City bombing?

A.  I kept asking the officers if I was under arrest.  They all said no.

Q.  How long were you in federal prison?

A.  Thirty-two days.

Q.  Were you free to leave any time you wanted to?

A.  When I was taken away that day, on April 21st, I kept asking them if I was under arrest.  They kept telling me no.

      Mr. McIntyre: Excuse me.  His question was, were you free to leave?

A. Well, no, I wasn't free to leave.  I was forcibly held against my will.

Q.  What is your understanding of the term arrest?

A.  Well, somebody that isn't free to leave or anything.

(Plaintiff's Dep. at 18-19).  Plaintiff further testified that he did not know whether he was

technically arrested for the Oklahoma City bombing.  (*Id.* at 19).

Also important to the Court's finding that Defendant's statement above is substantially

true is Plaintiff's relationship with Terry Nichols, his brother, and Timothy McVeigh.  Both

McVeigh and Terry Nichols were convicted of bombing the Oklahoma City Federal Courthouse;

therefore there is some connection between Plaintiff's arrest and the Oklahoma City defendants.

It is also important to note that Plaintiff was arrested only days after the Oklahoma City

bombing; the Oklahoma City bombing occurred on April 19, 1995 and Plaintiff was charged

with criminal acts on April 25, 1995.

The Michigan Court of Appeals has held that a "journalist need not describe legal

proceedings in technically precise language."  *Koniak v. Heritage Newspapers,Inc.,* 198 Mich.

App. 577, 583 (Mich. App. 1993).  In *Koniak,* the Court held that a report that a man had been

charged with 30-50 sexual assaults against his stepdaughter was substantially the same as an

accurate account of eight rapes, and an offer to plead "no contest" taken under advisement and

later dismissed, was substantially the same as reporting that the plaintiff "was willing to accept

the consequences of the conviction."   The Court provided:

> we cannot say that the article had a different effect upon the mind of the reader than
> would the literal truth.  A journalist's report need not describe legal proceedings in
> technically precise language.  This article was substantially true, and would not tend to
> prejudice the plaintiff any more than a similar article using technically precise language
> describing the literal truth.

(*Id.* at 583).  The Court finds that Defendant's statement was similarly "substantially true" based

upon the circumstances surrounding his arrest for the three "explosive charges" and the fact that

he was held as a material witness in the Oklahoma City bombing case.[4]  Therefore, the Court

finds that the statement that "Terry and James were both arrested in connection to the bombing"

is a substantially true and accurate statement.

> **c.**   **"The feds did not have the goods on James and the charges against him were**
>
> **in fact dropped."**

The statement the "feds did not have the goods on James and the charges against him

were in fact dropped" is literally and substantially true.  On August 10, 1995, the Government

moved to dismiss "all three explosives charges against James Nichols."  U.S. Attorney Press

Release, August 10, 1995.  The Webster's II New Riverside University Dictionary defines the

word "goods" in the phrase "the police had the goods on the gang" to mean "incriminating

information or evidence."  (Webster's II New Riverside University Dictionary at 539 (1988).

The government set forth in its August 10, 1995 Motion to Dismiss that "[a]s a result of the

continued investigation ... it is no longer more likely than not that the government would be able

to meet its burden of proof beyond a reasonable doubt."  (Defendant's Motion, Ex. K).

Accordingly, the Court finds that Defendant's statement that the "Feds did not have the goods"

on Plaintiff so the charges were dropped is substantially true.

Plaintiff claims that Defendant's use of the phrase "but the Feds didn't have the goods on

James, so the charges were dropped," was "meant to and intended to convey that Plaintiff was

involved in the Oklahoma City Bombing but got away with it, because the feds could not deliver

---

[4]Further, over a month after the bombing, it had been reported that "James Nichols has
not been directly linked to the Oklahoma City bombing, but some investigators believe he may
have been the driving force behind."  (Defendant's Reply, Ex. Q, *U.S. News & World Report*).

14

the goods against Plaintiff as they had with his fellow co-conspirators." (Complaint ¶16). The Court notes that the words "did not" were used by Defendant as opposed to "could not" which might have drawn a different meaning, i.e. had the evidence but could not get it to the court. The Court finds that Defendant's statement was literally true and accurately reported the government's dismissal of the charges.

Alternatively, Defendant argues that Defendant's statement is constitutionally protected opinion speech. Defendant argues that he is in a similar category to newspaper editorial columnists, and that Courts have held that an appearance on an editorial page clearly indicates to any reader that the opinions of the writer will be reflected in the column as opposed to only facts. (Defendant's Brief at 10, citing *Garvelink v. Detroit News,* 206 Mich. App. 604, 611 (Mich. App. 1994)). While Defendant's film "Bowling for Columbine" may be analogous to an editorial page in many respects, there remains a discernable difference between factual statements and opinion statements made therein. Bowling for Columbine is a documentary film with which Defendant himself on his website proclaimed in response to claims that the movie was not factually accurate:

> I can guarantee to you, without equivocation, that every fact in my movie is true. Three teams of fact-checkers and two groups of lawyers went through it with a fine tooth comb to make sure that every statement of fact is indisputable fact. Trust me, no film company would ever release a film like this without putting it through the most vigorous vetting process possible.

(Plaintiff's Response, Ex. 15). The United States Supreme Court has quoted a totality of circumstances to determine whether a statement is a fact or opinion which is useful instantly. These factors are: (1) the specific language used, (2) whether the statement is verifiable, (3) the general context of the statement, and (4) the broader context in which the statement appeared.

15

*Milkovich v. Loraine Journal,* 497 U.S. 1, 9 (1990).  The Court finds that Defendant's statement that the "Feds did not have the goods" on Plaintiff is a factual statement.  The Court finds that the specific language used indicates that it is factual; there is nothing to suggest otherwise.  The Court finds that the statement is verifiable.  The Court also finds that the context of the statement does not relate to the political theme of the film, which is a political commentary regarding guns and violence in the United States.  Rather, Defendant's statement related directly to a specific occurrence - the government's indictment and later dismissal of that indictment against Plaintiff.

Accordingly, the Court finds that Defendant's statement is not "constitutionally protected opinion speech" because Defendant made a factual statement.  As Defendant pointed out on his website, the film makes a distinction between factual statements and opinion statements "everything we say is true - and the things that are our opinion, we say so and leave it up to the viewer to decide if our point of view is correct or not for each of them."  (Plaintiff's Motion, Ex. 15).

In any event, the Court finds that Defendant's statements were factual and substantially true statements.  Therefore, the Court finds that Plaintiff's defamation claim as well as his False Light and Intentional Infliction of Emotional Distress claims fail because Defendant's statements were literally true.  Even if Defendant's statements were false, the Court still finds summary judgment appropriate because, as explained below, the Plaintiff is a public figure and he fails to meet the significant constitutional hurdle of actual malice.  Further, Plaintiff brings forth a defamation by implication claim which provides that even if Defendant's statements were literally true, there is a factual issue as to whether Defendant defamed Plaintiff by implication.  As set forth below, the Court this claim fails.

2.      **Is Plaintiff a Public Figure?**

For defamation law purposes, those who engage in the public discussion of controversial

issues become "public figures," as the United States Supreme Court set forth:

> [t]hat designation may rest on either of two alternative bases.  In some instances an
> individual may achieve such pervasive fame or notoriety that he becomes a public figure
> for all purposes and in all contexts.  More commonly, an individual voluntarily injects
> himself or is drawn into a particular public controversy and thereby becomes a public
> figure for a limited range of issues.  In either case such persons assume special
> prominence in the resolution of public questions.

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351 (1974).  The Court finds that Plaintiff is a limited

public figure because he has voluntarily injected himself into the public controversy surrounding

the bombing.  Plaintiff's Complaint provides that "[n]ews of the charges being dismissed against

James Nichols made both national and international headlines in May of 1995."  (Complaint

¶30).  After Plaintiff's release, he has voluntarily givens dozens of interviews to the media,

including regular appearances on every anniversary of the bombing.  (Plaintiff's Dep. at 25-60).

As this Court provided in its September 3, 2004 opinion:

> The Court takes judicial notice of the fact that Plaintiff voluntarily appeared for
> numerous media interviews subsequent to dismissal of the charges in the Eastern District
> of Michigan.  The Court further notes that Plaintiff has co-authored a book, titled
> "Freedom's End: Conspiracy in Oklahoma," discussing the Oklahoma City Bombing.
> Plaintiff's response brief to defendant's motion concedes that '[t]he Oklahoma City
> Bombing is surely a matter of public concern.'

(September 3, 2004 Opinion and Order, at 23).  The Court notes that Plaintiff has even testified

that he does not disagree with the Court's assertion quoted above.  (Plaintiff's Dep. at 29).

When a case involves a public controversy such as the instant case, the Sixth Circuit has

looked to the following factors in determining whether a defendant is a public figure:

> [t]he extent to which participation in the controversy is voluntary, the extent to which
> there is access to channels of effective communication in order to counteract false

17

statements, and the prominence of the role played in the public controversy.

*Wilson v. Scripps-Howard Broadcasting Co.,* 642 F.2d 371, 374 (6th Cir. 1981). The Court find

that all of the above factors are present. Plaintiff's book and numerous media appearances have

all been voluntary. Further, as evidenced by his book and interviews in which he is allowed to

tell his side of the story, Plaintiff has access to channels of effective communication in order to

counteract false statements. Lastly, the Court finds that Plaintiff has played a prominent role in

the public controversy as evidenced by the extensive press coverage relating to him.

Accordingly, the Court finds that for purposes of this lawsuit, Plaintiff is a "public

figure." Therefore, the Court finds that the actual malice standard of *New York Times v.

Sullivan*, 376 U.S. 254, 279-80 (1964) applies.

### 3.        The Application of *New York Times v. Sullivan*

The Michigan Court of Appeals quoting the seminal case of *New York Times v. Sullivan*,

provided:

> Where a public official or public figure is involved in a defamation case, the public
> official or public figure must prove that the publication was a defamatory falsehood and
> that the statement was made with actual malice, that is, that it was made with knowledge
> that it was false or with reckless disregard of whether it was false or not.

*Garvelink v. Detroit News,* 206 Mich. App. 604, 608.

For public figures, a showing of actual malice is subject to a clear and convincing

standard of proof. *Id.* quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342 (1974). The

finding of actual malice is a question of law. *Ireland v. Edwards,* 230 Mich. App. 607, 622

(Mich. App. 1998). In the *Ireland* case, the Michigan Court of Appeals provided:

> Actual malice is defined as knowledge that the published statement was false or as
> reckless disregard as to whether the statement was false or not. Reckless disregard for
> the truth is not established merely by showing that the statements were made with

preconceived objectives or insufficient investigations.  Furthermore, ill will, spite or even hatred, standing alone, do not amount to actual malice.  'Reckless disregard' is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but whether the publisher in fact entertained serious doubts concerning the truth of the statements published.

*Id.* at 622. (internal citations omitted).

The "reckless disregard" component of actual malice has been defined in Michigan

courts as well the United States Supreme Court as follows:

In order to satisfy the 'reckless disregard' test of actual malice, plaintiff was required to present evidence that the article was published with a high degree of awareness of probable falsity and that defendants in fact entertained serious doubts as to the truth of the matter published.

*Gaynes v. Allen,* 128 Mich. App. 42, 52 (Mich. App. 1983) (quoting *Garrison v. Louisiana,* 379

U.S. 64 (1964).   The Court notes that:

Summary judgment is an integral part of the constitutional protection afforded defendants in actions such as this.  Plaintiff has purposely been given the heavy burden of proving actual malice.

*Hayes v. Booth Newspapers, Inc.,* 97 Mich. App. 758, 775 (1980).

Defendant has testified that he did not mean to insinuate that Plaintiff participated in the

Oklahoma City bombing.  Defendant testified as follows:

Q.  When you told your audience that he had been arrested in connection with the Oklahoma City bombing, were you asking your to audience to infer that he had done something wrong in connection with the Oklahoma City bombing?

A.  Just the opposite.  I said that he was then released, and then I give him - - I then have him in the film, showing him being released and thanking, you know, people for supporting himself.  And then I went to the farm I then let him speak even more where he explained the practice-bomb situation in his own words.

(Defendant's Dep. at 208-09).  The Court finds that Plaintiff has failed to demonstrate that

Defendant's statements listed on page 3 of this Opinion were made "with knowledge that it was

19

false or with reckless disregard of whether it was false or not." *Garvelink,* 206 Mich. App. 608.

Conversely, the evidence demonstrates that Defendant honestly believed his statements to be

true. Defendant testified that he and his production team thoroughly researched the statements in

the film concerning Nichols, and he made the statements based on that research and his general

familiarity with Nichols from the media and court proceedings. (Defendant's Dep. at 11, 23-25,

48-49, 179-80).

It is important to note the constitutional hurdles faced by Plaintiff under the "actual

malice" standard *New York Times v. Sullivan, infra.* In *Time, Inc. v. Pape,* 401 U.S. 279, 290

(1971), the United States Supreme Court addressed the interpretation of a Civil Rights

Commission Report by Time magazine in which Time omitted the word "alleged" when

describing instances of police brutality by the plaintiff. The Court provided:

> Time's omission of the word 'alleged' amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of 'malice' under New York Times. To permit the malice issue to go to the jury because of the omission of a word like 'alleged,' despite the context of that word in the Commission Report and the external evidence of the Report's overall meaning, would be to impose a much stricter standard of liability on errors of interpretation or judgment than on errors of historical fact.

*Id.* at 290. In other words, if Defendant's statements are subject to a number of rational

interpretations (which the Court finds that they are), Plaintiff's interpretation is not enough to

create a question of fact under the actual malice standard of *New York Times, infra.*

Plaintiff cites the case of *Ellis v. Whitehead,* 95 Mich. 105 (1893) for the proposition that

Defendant's statements on the Oprah Winfrey show demonstrate malice on the part of Plaintiff.

Defendant stated on the Oprah Winfrey show that "McVeigh and Nichols were in the thumb of

Michigan living there for a number of months and making practice bombs and - in preparation

20

for Oklahoma City." (Oprah Winfrey Show, November 1, 2002, attached to Plaintiff's Complaint).  In *Ellis,* the plaintiff brought a slander action because the defendant called him a thief.  The Court held that evidence of another incident where plaintiff called defendant a thief was admissible to prove that the plaintiff had a malicious state of mind.  The Court finds that *Ellis* is not helpful because the "malicious state of mind" referred to in *Ellis* has no relevance to a modern court's understanding of "actual malice" which is defined "as knowledge that the published statement was false or as reckless disregard as to whether the statement was false or not." *Ireland* at 622.  Defendant's statement on the Oprah Winfrey show has no bearing as to his knowledge relating to the truthfulness of his statement in Bowling for Columbine.  In other words, while Defendant's contemporaneous statements on the Oprah Winfrey show, and even subsequent statements by his counsel may be "malicious" in one sense of the word, they were not "malicious" as defined by *New York Times.*

Therefore, as set forth above, the Court also finds summary judgment appropriate because Plaintiff has failed to demonstrate that Defendant's comments were made with "actual malice" under *New York Times v. Sullivan.*

### 4.      Was Plaintiff Defamed by Implication?

Plaintiff argues that even if Defendant's statements were literally true, there is a factual issue of defamation by implication.  The Court notes that "claims of defamation by implication, which by nature present ambiguous evidence with respect to falsity, face a severe constitutional hurdle." *Locricchio v. Evening News Ass'n,* 438 Mich. 84 (1991).  As the Michigan Court of Appeals has provided:

> Although Michigan recognizes the possibility of defamation 'by implication', such claims          face a severe constitutional hurdle.  Principles of general libel and First

21

> Amendment libel law continue to apply.  Michigan prohibits libel liability for true
> speech on matters of public concern.  Liability may not be imposed on a media
> defendant for facts it publishes accurately and without material factual omissions
> about public affairs.

*Royal Palace Homes v. Channel 7 of Detroit, Inc.,* 197 Mich. App. 48, 52 (Mich. App. 1992).

The Court finds that Plaintiff's failure to establish actual malice under *New York Times, infra*

and to demonstrate material factual omissions in the film, is fatal to his defamation by

implication claim.

Plaintiff cites *West v. Media General Operations, Inc.,* 250 F. Supp. 2d 923, 932 (E.D.

Tenn. 2002).  In *West,* the Court found that defendant defamed the plaintiff in the context of

several television broadcasts.  During the trial, at least fourteen separate allegedly false and

defamatory statements were identified. The Court addressed the defendant's argument that the

Court and jury should review each alleged defamatory statement in isolation, and provided:

> By isolating or segregating the words and phrases in each individual statement, the
> defendant seeks to minimize and dilute their overall false, defamatory effect and
> meaning.  However, the proper standard is for the jury and this Court to consider the
> combined effect and meaning of the alleged defamatory statements in the context of the
> television program as a whole.

(*Id.* at 934).  The Sixth Circuit reversed and remanded the case back to the district court in *West*

*v. Media General Operations, Inc.,* 120 Fed. Appx. 601 (6th Cir. January 15, 2005)

(unpublished).  The Sixth Circuit, did however, address defamation by implication, applying

Tennessee defamation law, and provided:

> [i]n order to answer the question of whether the meaning reasonably conveyed by a
> statement made in a television broadcast is reasonably understood in a defamatory sense,
> the video context in which the statement was made must also be examined.  As the
> district court explained, '[a] television director or reporter can, in many subtle ways, alter
> the tone and meaning of an otherwise innocuous broadcast through audio and visual
> editing techniques.'

(*Id.* at 617).  The Sixth Circuit further provided that a statement's context "cannot enlarge, extend, or change the sense of the [words]."  (*Id.* at 616).  The Court finds that *West* is not particularly helpful here.  As noted above, at trial there were at least fourteen allegedly false statements identified.  In this case, even taking the facts in a light most favorable to Plaintiff, the Court finds that Plaintiff has failed to demonstrate that Defendant's publication contained false statements or omitted material factual statements.  In fact, the film told its viewers that the charges against Plaintiff were dropped, and showed Plaintiff speaking to the press after his release and stating "I'm just glad to get on with my life."  (Plaintiff's Response, Ex. 14).

Defendant cites *Ramsey v. Fox News Network,* 351 F. Supp. 2d 1145 (D. Colo. 2005).  In *Ramsey,* the Court found that the plaintiff had failed to present a per se defamatory case.  The lawsuit centered around a Fox News broadcast which provided in pertinent part:

> Detectives say they have had good reason to suspect the Ramseys.  The couple and JonBenet's nine year old brother, Burke, were the only known people in the house the night she was killed.  JonBenet had been strangled, bludgeoned and sexually assaulted, most likely from one of her mother's paintbrushes.  The longest ransom note most experts have ever seen - - three pages – was left behind.  Whomever killed her spent a long time in the family home, yet there has never been any evidence to link an intruder to her brutal murder.

(*Id.* at 1147).   The Court found that the broadcast did not make a judgment as to who was involved in the murder nor did it urge any provably false factual connotation suggesting that plaintiffs were involved in the crime.  The Court similarly finds that Defendant's statements contain no provable false implication that Plaintiff committed any crime.  Plaintiff has failed to provide evidence that there were specific facts omitted from the publication.  Nor has Plaintiff proved that the statements in the film were false.  As one state court has provided:

> [i]n the absence of ... undisclosed facts, first amendment considerations dictate that an article concerning a public figure composed of true or substantially true statements is not

23

defamatory regardless of the tone or innuendo evident.  The goal of nurturing a free and active press in the political arena mandates denial of recovery if defamation 'depends fundamentally on an interpretation of various aspects of the [communication], not on anything directly said in it.'

*Strada v. Connecticut Newspapers, Inc.,* 477 A.2d 1005, 1010 (Conn. 1984) (quoting *Pierce v. Capital Cities Communications Inc.,* 576 F.2d 495, 500 (3d. Cir. 1978)).

Further, as *Royal Palace Homes, infra* provided, principles of general libel and First Amendment libel law continue to apply in a defamation by implication claim.  Accordingly, the Court grants Defendant's Motion for Summary Judgment of Plaintiff's Defamation by Implication claim.

### 5. Plaintiff's False Light and Emotional Distress Claims Fail for the Same Reasons as his Defamation Claim.

 The Court finds that Plaintiff's False Light and Invasion of Privacy and Emotional Distress claims are subject to the same First Amendment limitations as Plaintiff's defamation claim.  As the Michigan Court of Appeals provided in *Ireland*, while dismissing the plaintiff's intentional infliction of emotional distress claim:

> The Supreme Court has made it clear that the above limitations on actionability [of claims of defamation] (statements must be provable as false, statements must be understandable as stating actual facts about the plaintiff, and, in the case of public-official or public-figure plaintiffs, the plaintiffs must prove actual malice by clear and convincing evidence) are First Amendment limitations.  *Hustler Magazine* [*v. Falwell*, 485 U.S. 46 (1988)].  Thus, because all of plaintiff's claims are based on the same statements, and she cannot overcome the First Amendment limitations regarding these statements, summary disposition was properly granted with regard to all of plaintiff's claims.

(*Id.* at 624-25).   Similarly, based on the analysis above, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's False Light and Invasion of Privacy and Emotional Distress claims because all of these claims are based on the same statements.

24

**CONCLUSION:**

The Court grants Defendant's Motion for Summary Judgment in its entirety.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: July 13, 2005

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on July 13, 2005.

s/Jonie Parker
Case Manager

25